606 A.2d 315
STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. JEROME JOHNSON AND WANDA BONET,
DEFENDANTS–RESPONDENTS.

Argued September 24, 1991—Decided May 13, 1992.

*James D. Harris,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Alexander P. Waugh, Jr.,* Assistant Attorney General, of counsel).

*Diane Toscano,* Assistant Deputy Public Defender, argued the cause for respondent Jerome Johnson (*Wilfredo Caraballo,* Public Defender, attorney; *Diane Toscano* and *Joseph E. Krakora,* First Assistant Deputy Public Defender, on the briefs).

*Marcia Blum,* Assistant Deputy Public Defender, argued the cause for respondent Wanda Bonet (*Wilfredo Caraballo,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This criminal case requires the Court to revisit the defense of entrapment. Defendants, a police officer and his girlfriend, attempted to sell drugs pursuant to a plan that had been devised by law enforcement officers and proposed to defendants through an informant. As a result, defendants were indicted for drug and other related offenses. They then moved

to dismiss the indictment on the ground that they had been entrapped. The trial court dismissed the indictment, concluding that defendants had been entrapped as a matter of due process. The Appellate Division affirmed in an unreported opinion. This Court granted the State's petition for certification. 127 *N.J.* 327, 604 *A.*2d 601 (1991).

## I

During the summer of 1988, defendants, Jerome Johnson, a New Jersey State Trooper, and Wanda Bonet, his girlfriend, met a person with whom they used cocaine. Thereafter, on a fairly regular basis, that person supplied Johnson and Bonet with small amounts of cocaine. On one of those occasions, Johnson told his cocaine supplier, "I would like to rip off a drug dealer with a lot of cocaine and then I could turn around and sell it and make some money."

Some months later, Johnson's supplier was arrested while delivering a large quantity of cocaine to an undercover agent of the Drug Enforcement Task Force. The supplier thereafter decided to cooperate with law enforcement authorities by becoming an informant. He told agents of the United States Drug Enforcement Administration that Johnson would be willing to "rip off" drugs from a drug dealer and then sell those drugs for money.

The federal agents verified Johnson's employment as a State Trooper, and then communicated what they had learned to the New Jersey State Police. The two law enforcement agencies then jointly developed a plan to give Johnson the opportunity to steal drugs from a drug dealer and to sell those drugs. The plan contemplated that the informant would tell Johnson that he knew of an opportunity for Johnson to steal drugs from a drug courier and make a lot of money; that he, the informant, was acting as a broker for the sale of a kilogram of cocaine, and that he had arranged for a "mule," a paid courier, to transport the drugs by car to a meeting place with a prospec-

tive buyer; and that the informant and the seller of the cocaine would be in a second car following the mule. According to the plan, Johnson, wearing his State Trooper uniform, would pretend to make a traffic stop of the mule's car at a prearranged location on Frelinghuysen Avenue in Newark, and then would seize the cocaine. The seller of the cocaine, following in the car with the broker-informant, would see the seizure and chalk up the loss of the cocaine as a cost of doing business. Johnson then would meet the broker at Johnson's apartment and sell the cocaine to the mule for $5,000.

The informant thereafter presented and explained the scheme to Johnson. Johnson readily agreed to participate, adding new elements to the plan. He requested $1,000 cash in advance, an unmarked car, and a portable flashing red light to use to make the traffic stop. Johnson also indicated he would change shifts so that he would be off-duty at the time of the stop. Bonet, present during the meeting, actively participated in the conversation, at times explaining to Johnson how the plan would be accomplished.

On December 22, 1988, the informant and a detective, acting as the mule, met with defendants at defendants' Newark apartment. The parties reviewed and discussed the details of the plan. Bonet encouraged Johnson's participation, and both defendants actively engaged in the discussions and refinement of the plan. The detective gave Johnson $1,000 in marked one-hundred-dollar bills and the portable flashing red light. The participants arranged to meet again the following morning.

The next morning, Johnson, who had changed shifts, was supplied with the 1988 Chevrolet Caprice automobile to be used in stopping the mule. Johnson also viewed the car that the mule would be driving at the time of the stop and the precise location where the seizure of the drugs would occur. Johnson then changed into his State Trooper uniform. At approximately 11:30 a.m., the plan was put into effect. Driving the Chevrolet with the portable flashing red light and dressed in his

uniform, Johnson stopped the mule and seized from him one kilogram of cocaine. The informant and a special agent, posing as the seller, drove off. Johnson drove to his apartment, followed by the mule. On his arrival at approximately 12:05 p.m., Johnson was arrested. In his possession were the kilogram of cocaine, the Chevrolet, the flashing red light, and seven of the ten marked one-hundred-dollar bills. The sale of the cocaine back to the mule was not completed.

The State Grand Jury indicted defendants on five counts. Count One charged them with a second-degree conspiracy to violate the drug laws of this State, to exercise unlawful control over movable property of the State, and to commit misconduct in office, contrary to *N.J.S.A.* 2C:5–2. Count Two charged defendants with possession with intent to distribute a controlled dangerous substance, a first-degree crime contrary to *N.J.S.A.* 2C:35–5a(1) and *N.J.S.A.* 2C:35–5b(1). The third count charged possession of a controlled dangerous substance, a crime of the third degree, contrary to *N.J.S.A.* 2C:35–10a(1). Count Four charged theft of movable property, a second-degree crime contrary to *N.J.S.A.* 2C:20–3, and Count Five charged official misconduct in office, a second-degree crime contrary to *N.J.S.A.* 2C:30–2.

Defendants conceded for purposes of their motion to dismiss the indictment that they were predisposed to commit the crime, the effect of which was to raise the defense of entrapment only as a matter of due process. Because the parties did not dispute the facts concerning the nature of the government's conduct in investigating the crimes and predisposition was not an issue, they agreed to have the matter decided on the facts adduced in the Grand Jury proceedings. The lower courts were satisfied that the government conduct was improper and constituted entrapment as a matter of due process. That determination calls for an examination of the general doctrine of entrapment and the entrapment defense as it has evolved in this state. We can then address entrapment as a constitutional doctrine and

consider whether the facts in this case demonstrate that defendants were entrapped as a matter of due process.

## II

■ The defense of entrapment, which serves to excuse the defendant from criminal responsibility, can arise whenever a defendant introduces evidence of the government's involvement in the crime through initiation, solicitation, or active participation. Ted K. Yasuda, *Entrapment as a Due Process Defense,* 57 *Ind.L.J.* 89, 92 (1982) (*"Entrapment Due Process "*). There are two major, somewhat opposing views of entrapment: subjective and objective. The choice between the two theories usually "centers on whether the purpose of the entrapment defense is to deter government misconduct or to protect the innocent." Paul Marcus, *The Entrapment Defense* 81 (1989).

Subjective entrapment concentrates on the criminal predisposition of the defendant wholly apart from the nature of the police conduct. The defense will fail if the defendant was ready and willing to commit the crime. The subjective approach reflects the policy that law enforcement officials should detect existing crime rather than entice the innocent into committing crime. *State v. Dolce,* 41 *N.J.* 422, 432, 197 *A.*2d 185 (1964). Subjective entrapment protects the unwary innocent but not the unwary criminal.

In contrast, objective entrapment stresses the wrongfulness of government action without regard to the defendant's criminal predisposition. "The crucial question, not easy of answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of government power." *Sherman v. United States,* 356 *U.S.* 369, 382, 78 *S.Ct.* 819, 825, 2 *L.Ed.*2d 848, 856 (1958) (Frankfurter, J., concurring). Objective entrapment seeks to deter police misconduct, even if the unwary criminal goes free.

The determinative elements of the respective tests are the defendant's criminal predisposition and the government's conduct. The objective theory focusing on improper police conduct asks whether the government acts would have induced the average law abiding citizen to commit crime. The subjective theory stressing individual culpability asks whether the particular defendant would have committed the crime even without the government inducement. Kevin H. Marino, *Outrageous Conduct: The Third Circuit's Treatment of the Due Process Defense*, 19 *Seton Hall L.Rev.* 606, 612–13, 625, 630 (1989) (*"Outrageous Conduct"*). Although many courts purport to espouse either a pure subjective test or a pure objective test, "[a]s a matter of practicality, in many instances the application of the two theories overlap." *People v. Jamieson*, 436 *Mich.* 61, 461 *N.W.*2d 884, 889 (1990); *accord* Marcus, *supra*, § 304; Roger Park, *The Entrapment Controversy*, 60 *Minn.L.Rev.* 163, 179–84 (1976).

Under the subjective test, for example, in order to demonstrate that the predisposition of the defendant did not cause the crime, some courts suggest that highly improper police conduct may be found to be the cause of the crime. *United States v. Townsend*, 555 *F.*2d 152, 155 n. 3 (7th Cir.) ("even the most habitual offender can be entrapped if the officers use coercive inducement to overbear the defendant's reluctance"), *cert. denied*, 434 *U.S.* 897, 98 *S.Ct.* 277, 54 *L.Ed.*2d 184 (1977); *United States v. Watson*, 489 *F.*2d 504, 511 (3d Cir.1973) ("the stronger the inducement, the more likely that any resulting criminal conduct of the defendant was due to the inducement rather than to the defendant's own predisposition"). Emphasis on the nature of government conduct resembles the objective test.

Similarly, in objective entrapment, although the focus is whether the police conduct is likely to ensnare an average law abiding citizen, courts often perceive the average law abiding citizen as one who would not succumb to a simple invitation to commit a crime. *E.g., People v. Barraza*, 23 *Cal.*3d 675, 153 *Cal.Rptr.* 459, 467, 591 *P.*2d 947, 955 (1979); *State v. Tookes*,

67 *Haw.* 608, 699 *P.*2d 983, 987 (1985). Some courts believe that the defendant's obvious predisposition can mute the wrongfulness of police conduct, and, conversely, the defendant's lack of predisposition can magnify the wrongfulness of that conduct. *E.g., United States v. Batres–Santolino*, 521 *F.Supp.* 744, 751 (N.D.Cal.1981); Marcus, *supra*, at 90–92. Hence, depending on the circumstances, the emphasis on the defendant's predisposition "collapses" the objective test into the subjective test. Mark M. Stavsky, *The "Sting" Reconsidered: Organized Crime, Corruption and Entrapment*, 16 *Rutgers L.J.* 937, 947–49 & n. 81 (1985) (*"The 'Sting' Reconsidered "*).

Some jurisdictions pursue hybrid approaches combining both objective and subjective elements of entrapment. *See, e.g., State v. Molnar*, 81 *N.J.* 475, 486, 410 *A.*2d 37 (1980) (Code of Criminal Justice represents intermediate position between the subjective and objective views on entrapment); *see also Cruz v. State*, 465 *So.*2d 516, 521 (Fla.) ("subjective and objective entrapment doctrines can coexist"), *cert. denied*, 473 *U.S.* 905, 105 *S.Ct.* 3527, 87 *L.Ed.*2d 652 (1985); *Baird v. State*, 440 *N.E.*2d 1143, 1145–46 (Ind.Ct.App.1982) (explaining dual nature of Indiana's statutory entrapment defense); *People v. Isaacson*, 44 *N.Y.*2d 511, 406 *N.Y.S.*2d 714, 378 *N.E.*2d 78 (1978) (creating an entrapment test combining both subjective and objective aspects).

New Jersey recognized both forms of the entrapment defense prior to the adoption of the Code of Criminal Justice, which became effective in 1979. Historically, the common-law entrapment defense in New Jersey was based primarily on a subjective test. *See generally State v. Rockholt*, 96 *N.J.* 570, 574–76, 476 *A.*2d 1236 (1984) (a detailed history of subjective entrapment in New Jersey). The critical factor was the presence or absence of the defendant's predisposition to commit the crime, which depended on whether disposition to commit the crime originated with the defendant or with the police. This Court's opinion in *State v. Dolce, supra*, 41 *N.J.* at 430, 197 *A.*2d 185, explained that "[e]ntrapment exists when the criminal design

originates with the police officials, and they implant in the mind of an innocent person the disposition to commit the offense and they induce its commission in order that they may prosecute." Subjective entrapment was available only to a defendant who had "no predisposition to commit the crime induced by the government agents," *State v. Stein,* 70 *N.J.* 369, 391, 360 *A.*2d 347 (1976), or when "the criminal conduct was the product of the creative activity of law enforcement officials." *State v. Talbot,* 71 *N.J.* 160, 165, 364 *A.*2d 9 (1976). The basic purpose of subjective entrapment was to "protect the innocent from being led to crime through the activities of law enforcement officers but ... [not to] protect the guilty from the consequences of subjectively mistaking apparent for actual opportunity to commit crime safely." *Dolce, supra,* 41 *N.J.* at 431–32, 197 *A.*2d 185.

Although the entrapment defense first recognized in New Jersey was based on the subjective theory, the Court, in *Talbot, supra,* 71 *N.J.* at 168, 364 *A.*2d 9, adopted an objective theory of entrapment. That form of entrapment focused on the nature of police conduct and could arise "as a matter of law even though predisposition to commit the crime may appear...." *See Molnar, supra,* 81 *N.J.* at 484–86, 410 *A.*2d 37. Objective entrapment was "bottomed on the principles of fundamental fairness.... [T]he methods employed by the State must measure up to commonly accepted standards of decency of conduct to which government must adhere. The manufacture or creation of a crime by law enforcement authorities cannot be tolerated." *Talbot, supra,* 71 *N.J.* at 168, 364 *A.*2d 9. Nevertheless, even though police conduct was determinative under objective entrapment, the predisposition of the defendant was not wholly irrelevant and immaterial. According to the Court, the importance of the defendant's criminal intent decreases as the part played by the State increases, "until finally a point may be reached where the methods used by State cannot be countenanced, even though a defendant's predisposition is shown." *Id.* at 167–68, 364 *A.*2d 9.

Three years after *Talbot,* the Legislature adopted a statutory entrapment defense. When it enacted the Code, it was mindful of the prevailing theories of entrapment and the common-law background of the defense. Sean M. Foxe, *New Jersey Criminal Code Modifies Entrapment Defense,* 15 *Seton Hall L.Rev.* 464 (1985); Michael A. Gill, *The Entrapment Defense in New Jersey: A Call for Reform,* 21 *Rutgers L.J.* 419, 438–40 (1990) ("*Call for Reform*"). The Code "replaced the prior law of entrapment with a single statutory defense" that intertwined the two conventional strands of common-law entrapment. *Rockholt, supra,* 96 *N.J.* at 579, 476 *A.*2d 1236.

The Code defense of entrapment provides:

a. A public law enforcement official or a person engaged in cooperation with such an official or one acting as an agent of a public law enforcement official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such offense by * * *

\* \* \* \* \* \* \* \*

(2) Employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it. [*N.J.S.A.* 2C:2–12.]

However, the formulation of entrapment under the Code did not simplify the doctrine. The Code requires that the defendant address an objective prong that stresses the nature or character of government conduct. That conduct must involve (1) "methods of persuasion or inducement" that (2) create "a substantial risk" of the commission of a crime (3) by a person not otherwise "ready to commit [that crime]." *N.J.S.A.* 2C:2–12a(2). That test focuses on "the ability of the average person, rather than the particular defendant, to withstand inducements to engage in criminal activity." *Rockholt, supra,* 96 *N.J.* at 579, 476 *A.*2d 1236.

The Code also imposes a causation requirement, namely, that police conduct "as a direct result, cause[ ]" the defendant to commit the crime. *N.J.S.A.* 2C:2–12a. That constitutes a subjective prong because it focuses on the predisposition of the particular defendant. "This additional language," the Court

explained in *Rockholt*, "pinpoints the effect of the police action on the particular defendant and thus necessarily triggers an inquiry into the defendant's predisposition." 96 *N.J.* at 578, 476 *A.*2d 1236.

In this case, application of the Code standards was obviated because defendants, for the purpose of their motion to dismiss the indictment on constitutional grounds, conceded that they had been predisposed to commit the crime. However, traditional objective entrapment doctrine applies to a predisposed defendant under the rubric of due process entrapment. Therefore, objective entrapment principles remain relevant and instructive with respect to any inquiry into constitutional due process entrapment, the central issue of this case.

## III

Entrapment based on standards of due process may occur even though entrapment has not been established under a statute. *See State v. Medina*, 201 *N.J.Super.* 565, 576–77, 493 *A.*2d 623 (App.Div.) (*Talbot* defense is of constitutional due process nature and thus exists independently of *N.J.S.A.* 2C:2–12), *certif. denied*, 102 *N.J.* 298, 508 *A.*2d 185 (1985); *Commonwealth v. Mathews*, 347 *Pa.Super.* 320, 500 *A.*2d 853 (1985) (jury rejected defendant's entrapment defense under statutory objective approach, yet court used due process standard to bar conviction because police conduct was so egregious). This Court in *Rockholt* recognized that the pre-Code defense of entrapment had a constitutional basis in due process and that due process entrapment survived the enactment of the statutory entrapment defense. 96 *N.J.* at 580–81, 476 *A.*2d 1236. As explained in *Molnar*, 81 *N.J.* at 486, 410 *A.*2d 37, the rationale for the "objective entrapment" defense of *Talbot* was based on the constitutional considerations of due process and fundamental fairness. *Medina, supra,* 201 *N.J.Super.* at 576–77, 493 *A.*2d 623.

■ Due process entrapment is like traditional objective entrapment in that it concentrates on government conduct. *E.g., United States v. Valdovinos–Valdovinos,* 588 *F.Supp.* 551, 554–55 (N.D.Cal.), *rev'd on other grounds,* 743 *F.*2d 1436 (9th Cir.1984), *cert. denied,* 469 *U.S.* 1114, 105 *S.Ct.* 799, 83 *L.Ed.*2d 791 (1985). Due process entrapment, however, is an "involvement-based" doctrine, which focuses on the extent of the government's involvement in the crime, not merely on whether that conduct objectively or subjectively induced or caused the crime. *Outrageous Conduct, supra,* 19 *Seton Hall L.Rev.* at 613. Nevertheless, due process and objective entrapment serve like policies. 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* 83 n. 4 (Supp.1991). The similarity of policies and standards can obscure the distinction between ordinary objective entrapment and due process entrapment. *See United States v. Jannotti,* 673 *F.*2d 578, 608 (3d Cir.1982) (en banc) (the lines between objective entrapment and due process entrapment "are indeed hazy"), *rev'g* 501 *F.Supp.* 1182 (E.D.Pa.1980), *cert. denied,* 457 *U.S.* 1106, 102 *S.Ct.* 2906, 73 *L.Ed.*2d 1315 (1982); *Call for Reform, supra,* 21 *Rutgers L.J.* at 435 n. 136 (due process entrapment is distinguishable from the objective theory of entrapment "only in degree"); *see also United States v. Ramirez,* 710 *F.*2d 535, 539 (9th Cir.1983) (due process defense is "a close relative of entrapment" but it is independent); *cf.* Jeffrey N. Klar, *The Need for a Dual Approach to Entrapment,* 59 *Wash.U.L.Q.* 199, 216 (1981) (*"Dual Approach"*) (objective approach makes due process defense unnecessary).

■ The essence of due process entrapment inheres in the egregious or blatant wrongfulness of the government conduct. *E.g., United States v. Twigg,* 588 *F.*2d 373 (3d Cir.1978) (dismissing indictment for outrageous government conduct). "[A] defendant's conviction will be disallowed when the government's overall involvement in his crime was so outrageous as to violate due process." *Outrageous Conduct, supra,* 19 *Seton Hall L.Rev.* at 613. Thus, in *Rockholt,* the Court held that a constitutional underpinning of entrapment could be based on

police conduct that was "so egregious" as to offend due process. 96 *N.J.* at 576, 581, 476 *A.*2d 1236 (citing *dictum* from *United States v. Russell,* 411 *U.S.* 423, 431–32, 93 *S.Ct.* 1637, 1642–43, 36 *L.Ed.*2d 366, 373 (1973), which, in turn, cited *Rochin v. California,* 342 *U.S.* 165, 172, 72 *S.Ct.* 205, 209, 96 *L.Ed.* 183, 190 (1952) (holding evidence inadmissible because police conduct "shock[ed] the conscience")). In *Talbot, supra,* 71 *N.J.* at 167–68, 364 *A.*2d 9, the court referred to "commonly accepted standards of decency to which government must adhere" as the measure of fundamental fairness. *See* Edward G. Mascolo, *Due Process, Fundamental Fairness, and Conduct that Shocks the Conscience,* 7 *W.New Eng.L.Rev.* 1, 26–27 (1984) *("Fundamental Fairness.").*

Entrapment implicates concerns that have always been central to due process. Both share a concern over the "proper use of government power." *Sherman, supra,* 356 *U.S.* at 382, 78 *S.Ct.* at 825, 2 *L.Ed.*2d at 856. Both doctrines require that government adhere to its proper role and not abuse lawful power. *Sorrells v. United States,* 287 *U.S.* 435, 444, 53 *S.Ct.* 210, 213, 77 *L.Ed.* 413, 418 (1932). Wrongful government conduct also arouses the specter that relatively innocent persons may be coerced or seduced into crime. "When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." *Jacobson v. United States,* —— *U.S.* ——, ——, 112 *S.Ct.* 1535, 1543, 118 *L.Ed.*2d 147 (1992); *see Call for Reform, supra,* 21 *Rutgers L.J.* at 440 (defendant is less culpable when enticed into committing crime by government). That concern recognizes that entrapment is not only unfair, it is counterproductive. The creation of crime increases crime, it does not detect or deter it. *Id.* at 435 n. 133 (giving an example of a sting operation that itself created a rise in drug trafficking and gun thefts). Punishing the otherwise innocent offender would not serve any of the familiar goals of the criminal justice system. As cogently stated by the Ninth Circuit:

> Criminal sanction is not justified when the state manufactures crimes that would otherwise not occur. Punishing a defendant who commits a crime under such circumstances is not needed to deter misconduct; absent the government's involvement, no crime would have been committed. Similarly, a defendant need not be incarcerated to protect society if he or she is unlikely to commit a crime without governmental interference. Nor does the state need to rehabilitate persons who, absent governmental misconduct, would not engage in crime. Where the police control and manufacture a victimless crime, it is difficult to see how anyone is actually harmed, and thus punishment ceases to be a response, but becomes an end in itself—"to secure the conviction of a private criminal." [*Olmstead v. United States*, 277 *U.S.* 438, 485, 48 *S.Ct.* 564, 575, 72 *L.Ed.* 944 (1928) (Brandeis, J., dissenting).] Under such circumstances, the criminal justice system infringes upon personal liberty and violates due process. [*United States v. Bogart*, 783 *F.*2d 1428, 1436 (9th Cir.1986).]

Entrapment, like due process, monitors the relationship between government and its citizens. Respect for the governed insists that government be justified before it moves against any of its citizens. First, a contest between the government and its citizens is not a fair fight. *United States v. Jannotti, supra,* 673 *F.*2d at 615 (Aldisert, J., dissenting) (an objective theory of entrapment, which lets the "technical transgressor go free," recognizes the "awesome power of the financial and personnel resources" at the disposal of law enforcement authorities and encourages the proper use of those resources). Second, government should not have unfettered power to probe the public. *Call for Reform, supra,* 21 *Rutgers L.J.* at 440 (government should not be allowed to "stress test" morality of ordinary citizens). This latter concern in turn implicates the right to be let alone: "the government's ability gratuitously to generate crime through random honesty checks involves unjustified intrusion into citizens' privacy and autonomy." Bennett L. Gersham, *Abscam, the Judiciary, and the Ethics of Entrapment,* 91 *Yale L.J.* 1565, 1584, 1589 (1982); *see United States v. Bogart, supra,* 783 *F.*2d at 1436.

Due process and entrapment seek to uphold judicial integrity. Courts should not underwrite outrageous government conduct or the companion invasion of citizens' rights. As Judge Friendly observed in *United States v. Archer,* 486 *F.*2d 670, 677 (2d Cir.1973):

Government "investigation" involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.

Judicial integrity is compromised when courts impose criminal sanctions arising out of wrongful government conduct. *State v. Sugar,* 100 *N.J.* 214, 229, 495 *A.*2d 90 (1985); *State v. Kennedy,* 247 *N.J.Super.* 21, 30, 588 *A.*2d 834 (App.Div.1991); *see also Russell, supra,* 411 *U.S.* at 445, 93 *S.Ct.* at 1649, 36 *L.Ed.*2d at 381 (Stewart, J., dissenting) (courts should bar manufacture of crime to preserve their institutional integrity).

Constitutional due process and entrapment doctrine occupy much the same policy grounds. We accordingly reaffirm that entrapment is a defense as a matter of due process. The defense arises when conduct of government is patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of government, and offends principles of fundamental fairness. We explicitly found that defense on the New Jersey Constitution. *N.J. Const.,* art. I, para. 2.

The adoption of the defense of entrapment reposes within the authority of state courts. Federal principles of entrapment "are not controlling on the state courts which are free to formulate and establish the contours of the defense of entrapment for their own jurisdictions." *Talbot, supra,* 71 *N.J.* at 165–67, 364 *A.*2d 9. The entrapment defense based on due process reflects basic and distinctive state policies that have historically and consistently served principles of fundamental fairness, *e.g., State v. Abbati,* 99 *N.J.* 418, 493 *A.*2d 513 (1985), and preserved judicial integrity in the administration of criminal justice, *e.g., State v. Sugar, supra,* 100 *N.J.* at 228–29, 495 *A.*2d 90 (citing *Molnar, supra,* 81 *N.J.* at 484, 410 *A.*2d 37). Our own entrapment doctrine has honored those policies, namely, adherence to principles of fundamental fairness, *Talbot, supra,* 71 *N.J.* at 168, 364 *A.*2d 9; the refusal of courts to " 'permit their process to be used in aid of a scheme for the actual

creation of a crime by those whose duty it is to deter its commission,' " *id.* at 165, 364 *A.*2d 9 (quoting *Dolce, supra,* 41 *N.J.* at 431, 197 *A.*2d 185); and the fear that police would manufacture crime and ensnare unwary innocents. *Id.* (citing *Sherman, supra,* 356 *U.S.* at 372, 78 *S.Ct.* at 820–21, 2 *L.Ed.*2d at 851). Consideration of strong state policy impels us to recognize a due process right to an entrapment defense under principles of state constitutional doctrine. *E.g., State v. Williams,* 93 *N.J.* 39, 459 *A.*2d 641 (1983); *State v. Hunt,* 91 *N.J.* 338, 358–68, 450 *A.*2d 952 (1982) (Handler, J., concurring). *See generally* Robert F. Williams, *The New Jersey State Constitution: A Reference Guide* 31 (1990) (interpretation of state constitution influenced by distinctive factors).

██ Due process entrapment requires a comprehensive approach encompassing careful scrutiny of the nature of government conduct in light of all the surrounding circumstances "and in the context of proper law enforcement objectives." *People v. Isaacson, supra,* 406 *N.Y.S.*2d at 719, 378 *N.E.*2d at 83; *see United States v. Tobias,* 662 *F.*2d 381, 387 (5th Cir.1981), *cert. denied,* 457 *U.S.* 1108, 102 *S.Ct.* 2908, 73 *L.Ed.*2d 1317 (1982). Relevant factors are (1) whether the government or the defendant was primarily responsible for creating and planning the crime, (2) whether the government or the defendant primarily controlled and directed the commission of the crime, (3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable, and (4) whether the government had a legitimate law enforcement purpose in bringing about the crime. *See, e.g., United States v. Norton,* 700 *F.*2d 1072, 1075 (6th Cir.), *cert. denied,* 461 *U.S.* 910, 103 *S.Ct.* 1885, 76 *L.Ed.*2d 814 (1983); *People v. Isaacson, supra,* 406 *N.Y.S.*2d at 719, 378 *N.E.*2d at 83. Although courts have used varying formulations of the primary factors governing due process entrapment, the factors most invoked center around two major recurrent concerns: the justification for the police in targeting and investigating the defendant as a criminal suspect; and the nature and

extent of the government's actual involvement in bringing about the crime. Those principle elements serve to constitute the operative standard that measures due process entrapment.

## IV

■ We consider first whether the police had adequate justification to target and investigate defendants as criminal suspects. A defendant's conduct and circumstances and the law enforcement purpose for bringing about the crime are important aspects of this inquiry.

Whether the record reveals simply a desire to obtain a conviction of *any* person, without any purpose to prevent further crime or to protect the populace, can be significant. "In their zeal to enforce the law ... Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson, supra,* —— *U.S.* at ——, 112 *S.Ct.* at 1540; *see Sorrells v. United States, supra,* 287 *U.S.* at 444, 53 *S.Ct.* at 213, 77 *L.Ed.* at 418 ("It is not [the duty of the police] to incite and create crime for the sole purpose of prosecuting and punishing it."); *Isaacson, supra,* 406 *N.Y.S.*2d at 719, 378 *N.E.*2d at 83 ("proper law enforcement objectives [are] the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness"). Police are far less likely to create otherwise nonexistent crimes when the crime into which they lure defendant is part of an ongoing, present course of conduct. *See, e.g., Talbot, supra,* 71 *N.J.* at 169, 364 *A.*2d 9 (Schreiber, J., concurring) (ferreting out those engaged in criminal activity, ready and willing to continue in that course of conduct, is appropriate and proper). Hence, in most cases, the police should have a reasonable suspicion that the targeted defendant was participating in crimes similar to those charged. *See, e.g., Norton, supra,* 700 *F.*2d at 1075; *Batres–Santolino, supra,* 521

*F.Supp.* at 751–52; *Isaacson, supra,* 406 *N.Y.S.*2d at 719, 378 *N.E.*2d at 83; *Entrapment Defense, supra,* 21 *Rutgers L.J.* at 436–38. In addition to prior similar criminal activity, whether the defendant rather than the police initiated the original contact or instigated the criminal scheme is a relevant circumstance. Thus, in *Rockholt, supra,* 96 *N.J.* at 574, 476 *A.*2d 1236, the Court rejected the entrapment defense in light of the evidence that established that the defendant, a police officer, rather than the undercover detectives, had initiated the criminal transactions. *See, e.g., United States v. Jannotti, supra,* 501 *F.Supp.* at 1203; *Isaacson, supra,* 406 *N.Y.S.*2d at 719, 378 *N.E.*2d at 83; Molly K. Nichols, *Entrapment and Due Process: How Far is Too Far?,* 58 *Tulane L.Rev.* 1207, 1224 (1984).

In this case, the solicited crime involved the theft and sale of illegal drugs. Defendants had not been involved in similar crimes; their prior criminal activity consisted only of personal use of illegal drugs. Nevertheless, Johnson actually had the core idea for the crime. It was he, without any prodding by anyone, who first expressed the desire to "rip off" a drug dealer. Although the police devised the actual plan, it incorporated exactly Johnson's basic idea. That defendants had previously and regularly engaged in illegal personal drug use might not alone invite a police investigation beyond those kinds of offenses. *See, e.g., State v. Gibbons,* 105 *N.J.* 67, 80–85, 519 *A.*2d 350 (1987) (the similarity between a prior conviction for possession and a current charge of drug distribution is attenuated). Nevertheless, surrounding circumstances may generate the inference that defendants, though only drug users, might well commit a more serious crime. Johnson's expressed desire to steal and sell drugs itself indicates defendants had a need for money and drugs.

Moreover, Johnson, as a police officer, had the unique capability and ample opportunity to commit a serious drug offense. *Cf. Batres–Santolino, supra,* 521 *F.Supp.* at 752–53 (absent the contributions of the government, amateur defendants lacked resources, skills, and connections to distribute drugs

successfully). Johnson presumably was trained to cope with illegal drug activity and had contact with drug traffickers, lending plausibility to his expressed wish to escalate his illegal drug activity. That the cases have uniformly rejected the entrapment defense with respect to defendants who are law enforcement officers is not, we believe, a coincidence. Thus, in *Rockholt, supra*, 96 *N.J.* 570, 476 *A.*2d 1236, the defendant was a police officer who was convicted of misconduct in office for selling a motorcycle owned by his police department, receiving stolen police identification cards, and distributing a controlled dangerous substance. *See, e.g., Harrison v. Baylor*, 548 *F.Supp.* 1037 (D.Del.1982); *Jamieson, supra*, 461 *N.W.*2d at 894–95, 897.

The record thus fairly indicates that the police had cause not to discount Johnson's expressed desire to "rip off" a drug dealer as wishful thinking or an idle threat. Defendants initiated the chain of events that eventuated in the criminal acts. Johnson's position as a police officer with regular involvement in the drug world, coupled with his ongoing drug use and expressed desire to commit a more serious drug offense, created a sufficient likelihood that the desire would become the deed, even without government intrusion. Confronted with a realistic possibility of serious crimes by defendants involving drugs and official corruption, the police had a legitimate law enforcement purpose to expose and stop that kind of criminal activity. We conclude that under the circumstances, the police had adequate justification to direct their investigative authority against defendants.

Due process entrapment is equally concerned with the nature and extent of the police involvement in bringing about the crime. That broad consideration encompasses several factors, particularly the circumstances surrounding the creation of the crime, the methods undertaken by government to induce the defendant to commit the crime, and the actions entailed in the commission of the crime itself.

The police effort in the creation and manufacture of the crime is an aspect of the nature and extent of government involvement. Here, as noted, defendant Johnson authored the basic idea for the crime. When the police presented him with a specific criminal plan, he developed it further. He requested the unmarked car and the flashing red light in order to enhance the plan's success. He also insisted on the $1,000 prepayment, which indicated that he was fully committed to the criminal venture. In addition, Johnson intended to be in uniform and to change his regular shift at work to be available. Further, throughout the discussions, defendant Bonet actively and affirmatively encouraged Johnson's participation. The record, in short, does not suggest that the crime was primarily police-inspired.

The nature of the efforts directed to encourage defendants to commit the crime is another measure of the propriety of the government conduct. Tactics like heavy-handed pressure; repetitive and persistent solicitation, or threats or other forms of coercion; the use of false and deceitful appeals to such humanitarian instincts as sympathy, friendship, and personal need; and the promise of exorbitant gain are generally disallowed because they can overwhelm the resistance of ordinary people. *See Jacobson, supra,* —— *U.S.* at ——, 112 *S.Ct.* at 1542; *Jannotti, supra,* 501 *F.Supp.* at 1200; *Barraza, supra,* 153 *Cal.Rptr.* at 466, 591 *P.*2d at 954; *Isaacson, supra,* 406 *N.Y.S.*2d at 719, 378 *N.E.*2d at 83. In many cases, improper police conduct inheres in the resort to such tactics. In *Talbot, supra,* 71 *N.J.* at 163, 168, 364 *A.*2d 9, for example, even though there was no evidence that the defendant was reluctant, the police used repeated requests to persuade him both to buy and to sell the heroin. *See also, e.g., Jacobson, supra,* —— *U.S.* at ——, 112 *S.Ct.* at 1542 (Government excited defendant's interest in unlawful sexually explicit materials and exerted substantial pressure on defendant to obtain such materials "as part of a fight against censorship and the infringement of individual rights."); *Sherman, supra,* 356 *U.S.* 369, 78 *S.Ct.*

819, 2 *L.Ed.*2d 848 (government informant befriended defendant in drug rehabilitation program, repeatedly asked defendant to obtain drugs for him, claiming he was not responding to treatment, and used requests to persuade defendant to agree to obtain drugs for himself and informant and split costs); *Sorrells, supra,* 287 *U.S.* 435, 53 *S.Ct.* 435, 53 *S.Ct.* 210, 77 *L.Ed.* 413 (defendant yielded to repeated requests to obtain whisky for agent, who, masquerading as a tourist, emphasized that during World War I he had served in same military unit as defendant); *United States v. Gardner,* 658 *F.Supp.* 1573 (W.D.Pa.1987) (government agent badgered, induced, and used position to acquire defendant's friendship to induce defendant to obtain drugs for agent).

The police in this case did not resort to excessive inducements. There were no repeated requests or persistent solicitations in the face of unwillingness, nor was there any heavy-handed pressure brought to bear on defendants. The police did not appeal to humanitarian instincts involving sympathy, past friendship, or the like to persuade defendants to go along with the plan. No tactics, objectively considered, were calculated to overwhelm. The police conduct was "an invitation, not a seduction." *People v. Paccione,* 99 *Misc.*2d 1027, 417 *N.Y.S.*2d 850, 852 (Nassau County Ct.1979).

The extent of the police involvement in bringing about the crime also calls for consideration of whether the government directed and controlled the enterprise. That inquiry examines "the impact of the police activity on the commission of the crime," *see, e.g., Norton, supra,* 700 *F.*2d at 1075, and the "importance of the roles played by the government and the defendants in the offense." *Entrapment Due Process, supra,* 57 *Ind.L.J.* at 120 (citing *Twigg* and *Jannotti* ). It also looks to "whether the government provided essential materials or services and the likelihood defendants could have obtained them from another source." *Id.*

However, in gauging the reasonableness of the police techniques used in the commission of the crime, the type of crime, the level of danger involved, and the circumstances of the suspect are material considerations. Special efforts may be required to cope with the difficulties of investigating drug offenses and official corruption, particularly when law enforcement officers are involved. *Hampton v. United States*, 425 *U.S.* 484, 495 n. 7, 96 *S.Ct.* 1646, 1653 n. 7, 48 *L.Ed.*2d 113, 122 n. 7 (1976) (Powell, J., concurring); *see Russell, supra*, 411 *U.S.* 423, 93 *S.Ct.* 1637, 36 *L.Ed.*2d 366 (1973) (drug distribution is difficult to detect without sting operations); *United States v. Alexandro*, 675 *F.*2d 34, 43 (2d Cir.) ("the special relationship between the public and those who serve the Government" demands that law enforcement have available the weapons of "special investigative techniques to uncover insidious corruption"), *cert. denied*, 459 *U.S.* 835, 103 *S.Ct.* 78, 74 *L.Ed.*2d 75 (1982). We recognized that in *Talbot, supra*, 71 *N.J.* at 168, 364 *A.*2d 9: "government properly may use artifice to trap unwary criminals, particularly in its efforts to stamp out drug traffic."

Both illegal drug offenses and official corruption are present in this case. That the government sought to ferret out a corrupt member of law enforcement and that the corruption related to unlawful drug activity is clear. *E.g., People v. Rathbun*, 141 *A.D.*2d 570, 529 *N.Y.S.*2d 178, 179 (in a scheme in which police officers stole from drug dealers, police were not trying simply to obtain a conviction but to root out police corruption), *appeal denied*, 72 *N.Y.*2d 1049, 534 *N.Y.S.*2d 948, 531 *N.E.*2d 668 (1988).

Furthermore, Johnson's basic scheme, incorporated in the plan devised by the police, was inherently dangerous. As the danger a defendant poses increases, the permissible scope of police activities enlarges. *Dual Approach, supra*, 59 *Wash. U.L.Q.* at 213. The plan was for the commission of a predatory crime, a crime against criminals. The plot was intricate and called for careful timing and several participants who would

have to rely on one another. Much could go wrong. Those considerations strongly suggest that the scheme would have appealed not to an average law abiding citizen but only to someone—like a criminal or police officer—intimately familiar with illegal drug activity, with the background and knowledge to assess the feasibility of the criminal scheme, with the nerve and experience to deal with dangerous criminals, and with the training and skill to carry out the brazen plot.

However, the trial court was persuaded to find excessive and impermissible police involvement because it believed the crime had been orchestrated entirely by the police. It stressed that most of the "props" for the commission of the crime had been furnished by the police. Although the government did supply the unmarked car and the flashing red light, those were furnished at Johnson's request, and were hardly special or unique equipment for a police officer. *Cf. Batres–Santolino, supra,* 521 *F.Supp.* at 752–53 (defendants, who were amateurs, clearly did not have the "means" to commit the crime). Moreover, Johnson was the person who effected the stop and seizure of the cocaine, and presumably he did so with all the necessary accoutrements of a police officer—the uniform, badge, identification, and gun—to lend authenticity to the "police action." That the police relied on Johnson to play the major and most difficult role in the commission of the crime is obvious. Although Johnson was not the producer or director of the crime drama, he alone created its central theme. Most important, Johnson was its star, not a puppet or a patsy.

In the same vein, the lower courts stressed that the crime was a so-called "full circle" transaction in which the police arranged for both the supply and the sale of drugs by defendant. The courts below relied on *State v. Talbot, supra,* 71 *N.J.* 160, 364 *A.*2d 9, as stating unequivocally that due process entrapment occurs whenever the police resort to a full-circle transaction.

In *Talbot,* additional factors impugned the police conduct. As noted, the police made repeated requests to encourage defendant to commit the crime. 71 *N.J.* at 163, 364 *A.*2d 9. Nevertheless, we decline to hold that a *per se* due process violation occurs whenever the government attempts to prosecute a full-circle transaction. To that extent, we recast that interpretation of the *Talbot* decision. *See, e.g., People v. Roy,* 80 *Mich.App.* 714, 265 *N.W.*2d 20, 23 (1978) (full-circle transaction that was basis for prison guard's entrapment defense was a necessary investigative technique under the circumstances). The standard now adopted considers whether the police involvement in bringing about the crime was patently wrongful. The party supplying as well as purchasing the contraband continues to be an important factor in applying that standard, but the weight to be assigned to that factor will depend on all of the circumstances. *Batres–Santolino, supra,* 521 *F.Supp.* at 751. In this case, we conclude that the use of a full-circle transaction under the circumstances was a reasonable law enforcement technique and does not as such constitute patently wrongful government conduct.

Finally, we do not view the position of Bonet differently from that of Johnson with respect to the availability of the due process entrapment defense. The record contains no evidence to indicate that Bonet should or could have been approached in a different manner by the police with respect to her possible involvement in or disengagement from the criminal enterprise. In theory, it might not have been necessary from a law enforcement standpoint to encourage a police officer's lover into the commission of serious crimes simply to counter the danger to the public posed primarily by the criminally-inclined police officer. Nevertheless, in ferreting out the corrupt police officer removing such personal friends and willing participants from the investigation without jeopardizing the investigation itself may not be feasible. That is particularly true because Bonet previously had participated with Johnson in his past drug activity, was clearly his confidante, readily involved herself in

the criminal scheme, and directly and affirmatively encouraged Johnson to engage in the criminal activity. Under the circumstances revealed by this record, we see no need to differentiate the accomplice from the principal with respect to the availability of the entrapment defense.

## V

We conclude that the government conduct did not constitute entrapment as a matter of due process. That determination requires reinstatement of the indictment and a remand of the case for trial. Our ruling eliminates the need to address the State's argument that the trial court improperly dismissed the conspiracy and misconduct in office counts as being tainted by the entrapment on the drug counts. Those counts will be revived with the reinstatement of the indictment.

The status of statutory entrapment as an issue is not presented. Defendants, as noted, in raising the entrapment defense on constitutional grounds, conceded their criminal predisposition. However, we are unable to anticipate whether, on remand, defendants' criminal predisposition will be an issue and whether defendants will present any additional evidence relating to the Code's objective test of entrapment. Nevertheless, because objective entrapment is often subsumed by due process entrapment, our determination should guide the trial court and the parties if the statutory entrapment defense is raised.

The judgment is reversed and the matter remanded to the trial court to reinstate the indictment.

STEIN, J., concurring in part and dissenting in part.

The United States Supreme Court's "minority" view on the defense of entrapment had for some time been that "courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be

countenanced." *Sherman v. United States,* 356 *U.S.* 369, 380, 78 *S.Ct.* 819, 824, 2 *L.Ed.*2d 848, 855 (1958) (Frankfurter, J., concurring). Adherents to Justice Frankfurter's point of view, including Justice Roberts, see *Sorrells v. United States,* 287 *U.S.* 435, 453–59, 53 *S.Ct.* 210, 216–19, 77 *L.Ed.* 413, 423–26 (1932), Justice Stewart, see *United States v. Russell,* 411 *U.S.* 423, 439–45, 93 *S.Ct.* 1637, 1646–49, 36 *L.Ed.*2d 366, 377–81 (1973), and Justices Brennan and Marshall, see *Hampton v. United States,* 425 *U.S.* 484, 495–97, 96 *S.Ct.* 1646, 1652–54, 48 *L.Ed.*2d 113, 122–23 (1976), would doubtless be reluctant to find fault with the majority opinion in this case, in view of its forceful and unqualified recognition of a state constitutional "due process right to an entrapment defense" grounded in principles of fundamental fairness. *Ante* at 473–74, 606 *A.*2d at 322–23. Unfortunately, what the majority so generously bestows with one hand it promptly retracts with the other. Ignoring the trial court's conclusion that the crime in this case was "produced by the government, directed by the government, cast by the government and one in which the government even supplied the props," the Court holds that due process is not offended, primarily because defendant Johnson had allegedly confided on one occasion to a federal informant seeking favorable treatment for his own crimes that he had a "desire" to commit the offense for which he was indicted.

## I

The essential facts are set forth in the majority opinion. *Ante* at 460–63, 606 *A.*2d at 316–17. I add only such supplemental references to the record as may be necessary to focus the entrapment issue more sharply.

As noted, the direct source of information concerning defendant Johnson's alleged desire to "rip off" drugs from a drug dealer and sell the drugs for money was a federal informant who had been arrested on federal weapons charges and also charged with conspiracy and possession of a large quantity of

cocaine. The informant, who began cooperating with federal authorities after his arrest, was not called to testify before the grand jury. The informant's allegations about defendant Johnson were communicated to the grand jury second-hand by a special agent of the Federal Drug Enforcement Administration (FDEA) who had been in charge of the investigation leading to the informant's arrest. An assistant supervisor of the New Jersey State Police narcotics bureau gave testimony to the grand jury concerning the informant's motives:

> The informant had some very heavy federal charges lodged against him and like many drug dealers there is no honor among thieves. He was testifying against people that he had dealt with in order to reduce his sentence, in consideration for his sentencing.

The special agent testified that the informant and Johnson had used cocaine together on a few occasions, and that after their first meeting the informant gave Johnson small amounts of cocaine on a fairly regular basis. The agent testified that Johnson had identified himself to the informant as a New Jersey State Trooper. According to the agent, after the informant had been arrested, he disclosed his relationship with Johnson to federal drug officials, informing them that Johnson had expressed to the informant on an unspecified occasion a desire "to rip off a drug dealer with a lot of cocaine * * * and sell it to make some money." The agent testified that federal drug officials decided to "provide [Johnson] with the opportunity to do what he wanted to do." Acting through the informant, they then presented to Johnson the scheme described in the majority opinion. See *ante* at 460–463, 606 *A*.2d at 316–317.

The government's scheme, proposed to Johnson by the FDEA's informant, called for Johnson to make a "traffic stop" of an automobile operated by a Union County detective on assignment to the FDEA—but described to Johnson as a paid "mule"—who would be carrying a government-owned "bogus" kilogram of cocaine. The mule's car was to be followed by a second car transporting the informant, allegedly acting as a

broker for the sale of the cocaine, and the ostensible seller of the cocaine, a Jersey City police officer on assignment to the FDEA. The plan contemplated that the informant and the seller would leave the scene after Johnson stopped the mule's car, and the mule would give Johnson the package of cocaine. Johnson was then to drive back to his apartment with the cocaine. He was to be met there by the informant and the mule, turn over the cocaine to the mule, and be paid $5,000 for his participation.

When the informant presented the plan to Johnson, he agreed to participate and suggested two modifications: first, that he be paid $1,000 in advance; second, that he be supplied with a vehicle resembling a State Police vehicle, with a portable red light that could be installed on the dashboard. The federal agents agreed to both requests.

On the designated date, the informant and the mule provided Johnson with a 1988 Chevrolet Caprice that had been rented by the FDEA. They then drove with Johnson to Frelinghuysen Avenue in Newark and instructed him how and where to park his car in order to be properly situated to make the stop. After stopping the mule's car, Johnson drove to his apartment with the package of cocaine. On his arrival he was arrested. The package, described by a State Police officer as containing cocaine "in a very, very minuscule form," was on the front seat of his car. Seven of the ten hundred-dollar bills previously delivered to Johnson were in his possession.

Johnson was indicted for five offenses: official misconduct, *N.J.S.A.* 2C:30–2; theft of movable property, *N.J.S.A.* 2C:20–3; possession of a controlled dangerous substance, *N.J.S.A.* 2C:35–10a(1); possession with intent to distribute a controlled dangerous substance, *N.J.S.A.* 2C:35–5a(1) and –5(b)(1); and conspiracy to commit the foregoing offenses, *N.J.S.A.* 2C:5–2. The State's grand jury presentation demonstrates, however, that the alleged crimes, if committed, were victimless. The "bogus cocaine" that was the subject of the alleged "theft" and the

subject of the charges of possession and possession with intent to distribute belonged to and was recovered by the State Police. The charge of official misconduct was based solely on Johnson's participation in the government's plan. Every significant detail of the plan—other than the request for the flashing red light, a vehicle similar to State Police vehicles, and the cash advance—was conceived and executed by federal and state officials and the federal informant.

According to a State Police official's grand jury testimony, no evidence that Johnson had a drug problem or any "prior record" had been uncovered in the course of Johnson's State Police background investigation. Johnson had experienced no disciplinary problems during his service as a State Trooper other than a "minor problem" concerning lost equipment at Washington Station in Warren County, for which he had been reprimanded.

In the course of argument on the motion to dismiss the indictment on the basis of entrapment, Johnson's counsel explained that if the case had to be tried, the issue of Johnson's alleged predisposition was "clearly" one that would be disputed. Johnson's counsel conceded his client's predisposition solely for the purpose of the motion to dismiss, relying on *State v. Talbot,* 71 *N.J.* 160, 364 *A.*2d 9 (1976), for the principle that Johnson had been entrapped "as a matter of law even though predisposition to commit the crime may appear." *Id.* at 168, 364 *A.*2d 9.

## II

For the purpose of resolving fully the entrapment issue in this case, the existing record—consisting solely of the grand jury proceedings—inadequately serves the interests either of the State or defendants. As previously noted, with respect to the motion to dismiss the indictment defendant Johnson hypothetically conceded his predisposition to commit the alleged offenses, although intending to contest predisposition if the case were tried. The Court's opinion acknowledges that were it

not for that concession, the entrapment issue would also require application of the statutory entrapment defense enacted in the Code of Criminal Justice, *N.J.S.A.* 2C:2–12. *Ante* at 468–69, 606 *A*.2d at 320. The majority asserts that although the Code's entrapment provision stresses the nature or character of the government's conduct, it also imposes a causation requirement that "triggers an inquiry into the defendant's predisposition." *Ante* at 468–69, 606 *A*.2d at 320 (quoting *State v. Rockholt*, 96 *N.J.* 570, 578, 476 *A*.2d 1236 (1984)). The majority acknowledges that inquiring into defendant Johnson's predisposition was "obviated" because of defendant's concession. *Ibid.* The majority opinion takes into account the contingency that the statutory entrapment defense might be asserted at a later stage in the proceedings, *ante* at 483, 606 *A*.2d at 327.

Because in my view the character of the governmental conduct revealed by the grand jury record sufficiently establishes the due-process-entrapment defense embraced by the Court's opinion, *ante* at 472–75, 606 *A*.2d at 322–23, recognition of the State's law-enforcement interest compels the acknowledgment that the grand jury proceeding may not have included all of the evidence material to the State's contention that the entrapment defense should fail. Given the opportunity, the State might have offered additional evidence of predisposition or additional evidence tending to justify the government's aggressive role in facilitating defendant's commission of the charged offenses. Although the State's grand-jury presentation anticipated the entrapment defense to the extent of offering some evidence on the issue of predisposition, the evidence adduced before the grand jury was intended primarily to procure an indictment and not to rebut the defense of due-process entrapment.

In this and similar cases in which the due-process-entrapment defense is critical, both the trial court's initial disposition and appellate review would be facilitated by an evidentiary hearing that permitted development by all parties of a record on the

entrapment issue. That procedure has been invoked by a number of federal courts. See, *e.g., United States v. Bogart,* 783 *F.*2d 1428, 1429, 1433–34 (9th Cir.1986) (declining to adjudicate defendant's claim of due-process entrapment and remanding to district court for fact-finding on nature of and motivation for government's conduct); *see also United States v. Simpson,* 813 *F.*2d 1462, 1464 (9th Cir.) (reversing district court's dismissal of indictment based on due-process entrapment after eight-day evidentiary hearing), *cert. denied,* 484 *U.S.* 898, 108 *S.Ct.* 233, 98 *L.Ed.*2d 192 (1987). Had a hearing been conducted, defendant would not have had to concede the issue of predisposition and the State's justification for the governmental actions at issue could have been fully presented.

### III

The majority opinion recognizes and endorses a due-process-entrapment defense rooted in our state constitution, reflecting "basic and distinctive state policies that have * * * served principles of fundamental fairness," and that is unconstrained by federal entrapment principles. *Ante* at 473, 606 *A.*2d at 322. That formulation of this state's due-process-entrapment defense represents a sharp departure from the prevailing federal precedents that heretofore have narrowly limited the scope of the due-process-entrapment defense under the federal constitution. That defense was first identified by the United States Supreme Court in *United States v. Russell, supra,* 411 *U.S.* 423, 93 *S.Ct.* 1637, 36 *L.Ed.*2d 366, in which the Court reinstated the defendant's convictions for the illegal manufacture and sale of methamphetamine, reversing the Court of Appeals decision setting aside the conviction on entrapment grounds. In dictum, the Court observed that

[w]hile we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 US 165, 96 L Ed 183, 72 S Ct 205, 25 ALR2d 1396 (1952), the instant case is distinctly not of that breed. [411 *U.S.* at 431–32, 93 *S.Ct.* at 1643, 36 *L.Ed.*2d at 373.]

Subsequently, in *Hampton v. United States, supra,* 425 *U.S.* 484, 96 *S.Ct.* 1646, 48 *L.Ed.*2d 113, the Court affirmed the defendant's conviction for selling heroin to undercover federal agents, and rejected the defendant's contention that the trial court had erred in refusing to charge the jury that the defense of entrapment would bar the defendant's conviction if the informant who arranged the sale had also provided the defendant with the heroin. Justice Rehnquist's plurality opinion, retreating from *Russell*'s dictum, expressed the view that a defendant predisposed to commit a crime could never successfully assert as a defense the government's involvement in the crime. *Id.* at 488–90, 96 *S.Ct.* at 1649–50, 48 *L.Ed.*2d at 117–19. Justice Powell's concurring opinion disagreed, apparently acknowledging that due-process principles could justify a bar to conviction even in a case in which the evidence establishes the defendant's predisposition to commit the crime, *id.* at 492–95, 96 *S.Ct.* at 1651–53, 48 *L.Ed.*2d at 120–22, but emphasizing that such cases "will be rare." *Id.* at 495 n. 7, 96 *S.Ct.* at 1653 n. 7, 48 *L.Ed.*2d at 122 n. 7.

Although the federal courts acknowledge that a due-process-entrapment defense is available even with respect to a defendant predisposed to commit the alleged crime, in practice the defense has rarely been accorded recognition. *See* Ted K. Yasuda, *Entrapment as a Due Process Defense: Developments After Hampton v. United States,* 57 *Ind.L.J.* 89, 105–13 (1982). A few federal cases have applied the due-process-entrapment defense. See *United States v. Twigg,* 588 *F.*2d 373, 377–81 (3d Cir.1978); *United States v. Batres–Santolino,* 521 *F.Supp.* 744, 750–52 (N.D.Cal.1981); *United States v. Jannotti,* 501 *F.Supp.* 1182, 1203–05 (E.D.Pa.1980) (sustaining defense), *rev'd,* 673 *F.*2d 578 (3d Cir.), *cert. denied,* 457 *U.S.* 1106, 102 *S.Ct.* 2906, 73 *L.Ed.*2d 1315 (1982). The highly restrictive approach to the due-process-entrapment defense that characterizes the federal court opinions is based on the commonly-held view that "the due process channel which *Russell* kept open is a most narrow one," *United States v. Ryan,* 548 *F.*2d 782, 789

(9th Cir.), *cert. denied,* 429 *U.S.* 939, 97 *S.Ct.* 354, 50 *L.Ed.*2d 308 (1976), and 430 *U.S.* 965, 95 *S.Ct.* 1644, 52 *L.Ed.*2d 356 (1977), and the related view that the defense is available only where "the government is so involved in the criminal endeavor that it shocks our sense of justice." *United States v. So,* 755 *F.*2d 1350, 1353 (9th Cir.1985).

The due-process-entrapment defense has been applied some-what more aggressively by state courts. Paul Marcus, *The Entrapment Defense* § 7.11, at 308–14 (1989). See, *e.g., State v. Glosson,* 462 *So.*2d 1082 (Fla.1985) (applying due-process-entrapment defense based on sheriff's agreement to pay contingent fee of 10% of value of civil forfeitures to informant who sold drugs to defendant resulting in seizure and forfeiture of vehicles and over $80,000 in cash); *State v. Hohensee,* 650 *S.W.*2d 268, 270–75 (Mo.Ct.App.1982) (reversing on grounds of due-process entrapment defendant's conviction for burglary based on his conduct as lookout, when police officials paid two convicted felons to stage burglary by removing safe from building with police officer's assistance); *People v. Isaacson,* 44 *N.Y.*2d 511, 406 *N.Y.S.*2d 714, 378 *N.E.*2d 78 (1978) (invoking due-process-entrapment defense under New York State constitution to reverse defendant's conviction for selling drugs to informant who, having been brutalized by police and deceived into believing he faced prison sentence, induced and persistently solicited defendant to enter New York State and sell drugs to informant in quantity specified by police); *Commonwealth v. Mathews,* 347 *Pa.Super.* 320, 500 *A.*2d 853 (1985) (reversing defendants' convictions for manufacturing methamphetamine based on due-process entrapment where police provided defendants with funds to rent house, purchase chemicals, and buy food, and government narcotics experts had on several occasions provided defendants with step-by-step instructions for manufacture of methamphetamine).

In recognizing and forcefully endorsing a state-constitution-based defense of due-process entrapment, the majority opinion adheres to and enhances our existing entrapment jurisprudence.

In *State v. Talbot, supra,* 71 *N.J.* at 168, 364 *A.*2d 9, we held
that

> where an informer or other agent generally acting in concert with law enforce-
> ment authorities, furnishes a defendant with heroin for the purpose of then
> arranging a sale of the heroin by the defendant to an undercover officer, which
> sale is then consummated, defendant has been entrapped as a matter of law
> even though predisposition to commit the crime may appear, and notwithstand-
> ing that the furnishing of the heroin is unknown to and contrary to the
> instructions of the law enforcement authorities. Those authorities, having set
> the agent to work in enticing the defendant, the prosecution should bear the
> onus of the means selected by the agent. [*Ibid.*]

We noted in *Talbot* that our ruling was rooted in "the principle
of fundamental fairness." *Ibid.*

Having staked out a field of due-process-entrapment protec-
tion that extends considerably beyond the restrictive parame-
ters for relief recognized under federal law, the majority inex-
plicably declines to apply to the facts at hand the constitutional
principles so forcefully defined. It invokes a two-element test
with four factors in deciding whether the due-process defense is
available to these defendants, and proceeds to misapply three of
the four factors to the evidence adduced before the grand jury.
Concerning the first factor, "(1) whether the government or the
defendant was primarily responsible for creating and planning
the crime," *ante* at 474, 606 *A.*2d at 323, the Court emphasizes
that "Johnson actually had the core idea for the crime," *ante* at
476, 606 *A.*2d at 324, virtually ignoring the overwhelming role
of federal and state officials in crafting the elaborate details of
the plan.

With respect to the second factor, "whether the government
or the defendant primarily controlled and directed the commis-
sion of the crime," *ante* at 474, 606 *A.*2d at 323, the Court
observes that although the police presented Johnson with a
specific plan, he "developed it further" by requesting the un-
marked car, the flashing red light and the $1,000 prepayment.
The Court also stresses that Johnson "effected the stop and
seizure of the cocaine, and * * * did so with * * * the uniform,
badge, identification and a gun—to lend authenticity to the
'police action.'" *Ante* at 481, 606 *A.*2d at 326. The Court's

description of Johnson's participation in the government's scheme may be accurate, but it begs the question. That the government—not Johnson—primarily controlled and directed the commission of the crime is incontrovertible.

I concur in the Court's view concerning the third factor that the methods used by the government to involve defendant Johnson in the commission of the crime were not unreasonable. *Ante* at 478–79, 606 *A*.2d at 325. The record does not reflect any excessive inducement in obtaining Johnson's cooperation.

The fourth factor considers "whether the government had a legitimate law enforcement purpose in bringing about the crime." *Ante* at 474, 606 *A*.2d at 323. The Court concedes that "[d]efendants had not been involved in similar crimes," *ante* at 476, 606 *A*.2d at 324, but concludes that Johnson's status as a police officer and his opportunity for "contact with drug traffickers" created a "realistic possibility of serious crimes by defendants involving drugs." *Ante* at 477, 606 *A*.2d at 324. That so-called "realistic possibility" on which the Court's opinion so precariously rests is based entirely on the hearsay statement offered by a federal informant facing serious drug charges in an attempt to make a "deal." In concluding that "the police had adequate justification to direct their investigative authority against defendants," *ante* at 477, 606 *A*.2d at 324, the Court apparently is prepared to credit fully the informant's allegations without discounting their credibility to reflect the informant's acknowledged self-serving motivation.

A more basic question arises with respect to the justification for the government's creation of a scheme intended to induce Johnson to commit the crimes with which he was charged. The grand jury record indicates that the informant had reported to federal officials that Johnson had used cocaine on numerous occasions, an allegation that undoubtedly could have been a basis for the institution of departmental disciplinary or removal proceedings. *Cf. In re Carberry*, 114 *N.J.* 574, 578, 556 *A*.2d

314 (1989) ("The use of illegal drugs is incompatible with the integrity of the State Police and with the ability of troopers to perform their duties."). On the assumption that Johnson's prior use of cocaine would have warranted his expulsion from the State Police, both the necessity and propriety of the elaborate scheme concocted by federal and state officials to entrap Johnson are highly questionable.

In my view, the due-process-entrapment defense based on our State constitution and endorsed by the Court's opinion, *ante* at 472–75, 606 *A*.2d at 322–23, warrants dismissal of the indictment on the record before us. Defendants' crimes were almost entirely the product of governmental planning, ingenuity, and resources. The record presents but meager justification for the governmental decision to stage those crimes in order to procure defendants' convictions. Some would doubtless argue that neither the government's staging of those "crimes" nor its limited justification for targeting defendant Johnson should be of any concern to the judiciary: "[T]he defense of entrapment * * * was not intended to give the judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve." *United States v. Russell, supra,* 411 *U.S.* at 435, 93 *S.Ct.* at 1644, 36 *L.Ed.*2d at 375. However, as the majority opinion acknowledges, a primary purpose of our due-process-entrapment defense is to "preserve[ ] judicial integrity in the administration of justice." *Ante* at 473, 606 *A*.2d at 322. Hence, when the judiciary is presented with a crime manufactured by the government, its duty is to scrutinize the record and determine whether the government's involvement under the circumstances exceeds the proper use of governmental power. "Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake." *Sherman v. United States, supra,* 356 *U.S.* at 380, 78 *S.Ct.* at 825, 2 *L.Ed.*2d at 856 (Frankfurter, J., concurring).

The unseemliness of the government's role in this case compellingly justifies the application of a due-process-entrapment defense:

> We have not accepted the view that this highly discrete group of extreme cases of police brutality defines the limits of unconstitutionally outrageous governmental conduct. We have held that law enforcement conduct also becomes constitutionally unacceptable "where government agents engineer and direct the criminal enterprise from start to finish," *Ramirez*, 710 F.2d at 539; *So*, 755 F.2d at 1353, or when governmental conduct constitutes "in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant." *Ramirez*, 710 F.2d at 540.
>
> \*   \*   \*   \*   \*   \*   \*   \*
>
> Our view, shared by Justice Brandeis, that a crime manufactured by the government "from whole cloth" would constitute outrageous conduct also has a firm jurisprudential basis. Criminal sanction is not justified when the state manufactures crimes that would otherwise not occur. Punishing a defendant who commits a crime under such circumstances is not needed to deter misconduct; absent the government's involvement, no crime would have been committed. Similarly, a defendant need not be incarcerated to protect society if he or she is unlikely to commit a crime without governmental interference. Nor does the state need to rehabilitate persons who, absent governmental misconduct, would not engage in crime. Where the police control and manufacture a victimless crime, it is difficult to see how anyone is actually harmed, and thus punishment ceases to be a response, but becomes an end in itself—"to secure the conviction of a private criminal." [citation omitted]. Under such circumstances, the criminal justice system infringes upon personal liberty and violates due process. [*United States v. Bogart, supra*, 783 F.2d at 1436.]

## IV

As noted, *supra* at 487–88, 606 A.2d at 329–30, I do not consider the present record adequate for the resolution of the due-process-entrapment issue. Accordingly, I would remand the matter to the Law Division for an evidentiary hearing that would permit the parties to supplement the existing record. Based on the record before us, I would affirm the judgment of the Appellate Division.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

Concurring in part, dissenting in part—Justice STEIN—1.