916 A.2d 493 (2007)
390 N.J. Super. 573
STATE of New Jersey, Plaintiff-Respondent,
v.
James R. DAVIS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 2006.
Decided February 27, 2007.
*496 Edward C. Bertucio, Eatontown, argued the cause for appellant (Hobbie, Corrigan, Bertucio & Tashjy, attorneys; Norman M. Hobbie and Mr. Bertucio, of counsel; Mr. Bertucio, on the brief).
Johanna Barba Jones, Deputy Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General, attorney; Ms. Jones, of counsel and on the brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
LEFELT, P.J.A.D.
Detectives from the Monmouth County Prosecutor's Office arrested defendant, James Davis, a Holmdel police officer, after an undercover investigation revealed that he had conversed on the internet about sex and masturbation with an undercover officer who had portrayed herself as a fourteen-year-old girl. Upon defendant's arrest, the police discovered in his apartment diskettes containing pornographic images of alleged children. Defendant claimed that he had committed no crime as he was fantasy role-playing with women he thought to be over the age of sixteen, and that any possession of pornographic images was inadvertent. Despite these defenses, a jury convicted defendant of several counts of attempting to endanger the welfare of a child, endangering the welfare of a child, and attempted sexual assault. Judge Chaiet imposed a seven-year aggregate prison sentence and defendant appealed, raising numerous arguments, including, among others, the need for severance and the improper use of other-crimes or bad-acts evidence. We reject all of defendant's arguments and affirm.

I.
Defendant came to the attention of the San Diego Police Department, the Morris County Prosecutor's Office, and the FBI as someone who appeared to be sexually pursuing children on the internet. The Monmouth County Prosecutor's Office began *497 an undercover investigation of defendant after receiving reports from the other authorities regarding defendant's sexual activities, and after V.P., who was sixteen years old at the time, told the Parsippany Police Department that she had had a sexual relationship with defendant between September and October of 2000. Because defendant began his relationship with V.P. before she became sixteen, the Monmouth County Prosecutor's Office, from January 2001 to March 2002, surveilled defendant, monitored his computer chatroom conversations, and conversed over the internet and telephone with defendant under the guise of a fourteen-year-old girl named Krissy.
Two officers played the part of Krissy during internet and telephone conversations, and in a picture sent to defendant. Before conversing with defendant over the internet, one of the officers posing as Krissy also created a "profile," an accessible description of the person linked to the person's screen name, describing her as a freshman in high school and revealing age appropriate interests.
On March 22, 2001, Krissy initiated an instant message conversation with defendant. During the various internet conversations relevant to this case, defendant used either MisterRight2 or NJRoboCopI as his screen name.
Krissy began the first conversation by talking about the New Jersey Devils. That apparently interested defendant, as he asked: "Why are all the great women all so young?" Presumably he had accessed her profile. Krissy answered with question marks. Although this conversation ended shortly thereafter, at Krissy's request, defendant e-mailed his picture to her.
From that date until April 19th, defendant had several conversations with Krissy. These conversations included discussions about hockey, music, and sex, focusing mostly on masturbation, and how steps could be taken to prevent Krissy's mother from learning of their conversations. At one point, Krissy agreed to send defendant her picture, although the picture sent was actually of a twenty-three year old police officer sitting in a tree, wearing a Devil's jersey and backwards baseball hat. Defendant thought she was "very pretty."
During their second conversation on March 24, 2001, defendant asked Krissy if she was a "physical person," as in "romantic stuff." Defendant asked her whether she pleased herself and Krissy answered "[m]y buds talk about it but I've tried. Never, sorry, tried I mean." Defendant told her having sex was "the most intense feeling you will ever feel with the right person that is. You can make yourself feel that way too just not as intense." Although defendant offered to teach her over the phone, Krissy refused claiming that her mother was home. Krissy asked: "How?" and defendant answered: "Want me to tell you how? Like teach you?" Krissy answered: "Okay." Nothing more was said about it at that time.
On March 31, 2001, while defendant was at work, he sent Krissy an e-mail apologizing for not telephoning her as he had said he would.
During their third conversation on April 2, defendant asked Krissy if she had "masturbated or tried" lately. Krissy answered that she had but that she was not sure if she had done it right. Defendant asked if she had talked to her friends about how they do it and she said that she would not feel comfortable doing that. Defendant encouraged her to discuss masturbation with her friends, and to ask them to show her how they do it. He again offered to teach her, over the phone, how to do it.
*498 On April 16, 2001, they had their fifth instant message conversation. Once again, defendant told Krissy that he wanted to call her and asked whether she had talked to her friends about masturbating. He then told her that he likes to tease, "not have sex just tease." When Krissy asked "how do you tease," he replied "[w]e watch each other" and he helps her "learn how to play." He explained that he was "a great kisser, very soft and yet masculine."
On April 17, 2001, Krissy e-mailed defendant her cellular telephone number and asked him to call at a particular time. Defendant opened the e-mail while at work and called Krissy. During this brief conversation, defendant told Krissy that he had a nine-year-old son. Defendant did not, in fact, have a son, but he had a daughter who was in her late teens. Later that day, they had another brief conversation talking about hockey, music and defendant's son. The tenor of their subsequent April 18 conversation, while defendant was at work, was largely the same.
It was not until April 19 when the defendant initiated the most explicit dialogue. On that day, defendant explained to Krissy that when he was her age his sister told him that she and her friends masturbated together and that it was natural for them to do so. He used this as a segway to again offer to teach her how to masturbate. At that point Krissy accepted his offer, and defendant proceeded to tell her, step-by-step, how to touch her abdomen, inner thighs, and the outside of her vagina. He then explained that some girls like "to put something inside of them, . . . like a dildo, a vibrator," or their fingers.
Later on that same day, in an instant message, defendant asked Krissy if she liked the way touching herself felt and if she "[w]ant[ed] to try in person to," as he "could show [her] more that way." Krissy said she wanted to meet him in person and asked where they should meet. Defendant suggested a park, saying "we're not going to do much. If you want, we won't do anything at all." He then asked: "Can you wear like a skirt when we meet? . . . Be easier to help you when you're wearing a skirt." Krissy said that she could and that they should meet at the Belmar Marina tomorrow at about 3:30 p.m.
Defendant then asked her if she shaved "everything," what size bra she wore and whether she "want[ed] to do more than that[,] what we talked about." Krissy told defendant, "I've never done it before, does it hurt?" Defendant said it depends on how excited you are and promised that he would never hurt her. Krissy told defendant that she did not want to get pregnant, and he explained that he had undergone a vasectomy. At that point, defendant urged Krissy to tell him what she wanted when they met. She said that she felt stupid telling him because she was inexperienced. Defendant told her to never feel stupid and that he would "love to hear what you want."
The next day, on April 20, the officer who had supplied the picture of herself waited for defendant at the Marina. He never arrived. Shortly before 3:30, he called her cellular phone and told her that he had been in a car accident. That was not true, however, as police knew from their surveillance that he was at his apartment.
The next conversation Krissy and defendant had was not until May 1, by instant message, when defendant apologized again for not meeting her. On May 2, defendant called again. During that conversation Krissy told defendant that she had masturbated since the last time they talked but she was still not sure she was doing it right. After Krissy claimed to be too embarrassed to explain what she had done, defendant again instructed Krissy on how *499 to masturbate. He told her how to fondle her breasts, rub her "finger across your clit," and "push your fingers, [inside your vagina] . . . towards your stomach." Krissy pretended to be doing as defendant instructed.
The next conversation occurred on May 15 where they again discussed a meeting time. On May 21, defendant told her he had told a thirty-two-year-old female friend about Krissy, and that she would like to help teach Krissy how to masturbate. He said he would be there with the two of them if Krissy wanted him to.
The next conversation was on June 5, when defendant said his friend was scared because of Krissy's age. On June 20, defendant again contacted Krissy after she sent defendant an e-mail announcing that the last day of school had passed. He asked if she was still interested in meeting with him and his friend. She answered yes, but thought that the friend was scared. Defendant said his friend wanted to talk to Krissy over the phone first. That night, defendant's friend sent Krissy an instant message. Shortly, thereafter, defendant sent Krissy an instant message, asking whether she had spoken to the friend and whether they discussed speaking on the phone. Krissy said that the friend did not mention calling her.
On June 28, defendant and Krissy had their last conversation. Defendant said: "[my friend] doesn't think you are real." Krissy said the friend did not say that. Defendant insisted that was the case. Soon thereafter, defendant went off-line. No further conversations occurred.
In February 2002, defendant cancelled his America Online account, which prompted the Prosecutor's Office to question him on March 26, 2002. When informed by Lieutenant Peter Short from the Monmouth County Prosecutor's Office that the Office had been investigating his internet activities with a police officer who had posed as a fourteen-year-old girl, defendant admitted "role-playing" with females online, but contended that he believed them to be eighteen years old, or older. He said he could determine the girls' ages by listening to their voices over the telephone. He said he cancelled his AOL account because he had a steady relationship and felt guilty about the secret relationships he had with other females.
Lt. Short also told defendant that the Prosecutor's Office was interested in whether he had ever accessed child pornography over the internet. Defendant said that if he had seen any child pornography on his computer he would have deleted it. Short then showed defendant a picture that was stored on a floppy diskette police had seized from defendant's apartment pursuant to a search warrant. The picture depicted "a young female engaged in a sexual act with a female." Defendant said the picture wasn't his. He explained that he sometimes received e-mails from individuals and that he "saves them to disks for the purpose of saving space on his hard drive." After reviewing the images, defendant would delete them from the disc. Short asked why he did not report receiving the image, as it was contraband, and defendant answered that it was an error in judgment.
In executing the search warrant in defendant's apartment, the police found two pornographic pictures of alleged children on a floppy diskette, one pornographic picture of an alleged child on defendant's hard drive, and "several video files" on defendant's hard drive. Defendant's computer also had installed on it a program called "Evidence Eliminator" that "erases the person's [computer's] information on previously deleted files and things that are looked at, viewed on the internet." The *500 program was accessed and deleted on the same day.

II.
Based largely upon these facts, the grand jury issued a multi-count indictment charging defendant with ten crimes. The first eight counts related to defendant's conversations with Krissy between March 22, 2001 and June 28, 2001. Count one charged defendant, between March 24, 2001 and June 28, 2001, with third-degree attempting to endanger the welfare of a child. N.J.S.A. 2C:24-4a; N.J.S.A. 2C:5-1a(1). Count two charged defendant, between March 24, 2001 and June 28, 2001, with "[l]uring or [e]nticing a [c]hild by attempting, via electronic or any other means to lure or entice a child . . . into a motor vehicle, structure, or isolated area, or to meet or appear at any other place, with a purpose to commit a criminal offense with or against the child." The third, fourth, and fifth counts charged second-degree official misconduct on March 31, 2001, April 17, 2001, and April 18, 2001, "by committing an act relating to his office as a public servant but constituting an unauthorized exercise of his official functions." N.J.S.A. 2C:30-2(a). These charges related to the brief conversations defendant had with Krissy, by e-mail and phone, while he was at work. The sixth, seventh, and eighth counts charged defendant on April 19, 2001, the date defendant was to meet Krissy, and May 2, 2001, the date defendant taught Krissy by phone how to masturbate, with second-degree attempting "to commit the crime of Sexual Assault by doing an act constituting a substantial step in a course of conduct planned to culminate in the commission" of sexual assault and by "engaging in conduct which would constitute the crime of [s]exual [a]ssault if the attendant circumstances were as a reasonable person would believe them to be." See N.J.S.A. 2C:14-2c(4); N.J.S.A. 2C:5-1a(3).
Finally, the last two counts related to the pornographic images found during the search of defendant's apartment. Counts nine and ten, respectively, charged defendant with second-degree official misconduct between November 3, 1999 and March 26, 2002, "by knowingly refraining from performing a duty which is imposed upon him by law," N.J.S.A. 2C:30-2, and with fourth-degree endangering the welfare of a child "by knowingly possessing or viewing any photograph film, videotape, computer program or file, video game or any other reproduction or reconstruction which depicts a child engaging in a prohibited sexual act or in the simulation of such an act." N.J.S.A. 2C:24-4(b)(5)(b).
At trial before Judge Chaiet and a jury, the State called a pediatrician who testified that sixteen of the images seized from defendant depicted children less than sixteen years old. Another expert testified that none of the pornographic images or videos had been altered or computer generated.
The State also admitted much other-crimes or bad-acts evidence against defendant. This evidence consisted of V.P.'s testimony regarding how she was fifteen years old when she met defendant on the internet, how their conversations turned to sex, and how after she became sixteen they met personally and had sex. In addition, the State admitted evidence of four online discussions defendant had with undercover State and Federal police officers from San Diego, Los Angeles, Ocean County, and Bergen County, posing as underage children. All of the conversations were recorded, but none resulted in meetings between defendant and the undercover officers. Each conversation reflected defendant's interest in underage females, and two conversations involved the topic of *501 masturbation. No indictment arose from any of these conversations.
The State also presented defendant's thirty-four-year-old female friend. She had met defendant on the internet in a daddy/daughter role-playing chat room. She testified that defendant was fascinated by her bisexuality and aggressively pursued his interest in participating in three-somes with a girl between the age of 14 and 17. According to the friend, defendant was interested in young girls who were "15 or so."
At the close of the State's case, the court denied defendant's motion for a judgment of acquittal, but dismissed count two (luring), as unsupported by the evidence. Thereafter the jury returned a guilty verdict on all remaining charges. Subsequently. Judge Chaiet denied defendant's second motion for judgment of acquittal or, in the alternative, a new trial, and sentenced defendant.
At sentencing, the court denied defendant's third motion for a judgment of acquittal and new trial; merged counts one into six, seven, and eight; and imposed a seven year sentence on counts three through nine, to run concurrently with each other; and on count ten, the court imposed a concurrent sentence of nine months imprisonment. Judge Chaiet did not impose any period of parole ineligibility but did impose the strictures of Megan's law and forfeited defendant's public employment with the Holmdel Police Department.

III.
On appeal, defendant raises seven points for our consideration. First, he argues that the trial court improperly refused to "sever counts 9 and 10 for a separate trial from counts 1 through 8" or "at a minimum" conduct "a sequential trial before the same jury after it rendered its verdicts on counts 1 through 8." Second, defendant argues that the court "improperly admitted the State's N.J.R.E. 404(b) evidence." Third, the judge's instructions on 404(b) evidence and the defense of entrapment "were contradictory, confusing and had the clear capacity to mislead the jury." Fourth, the court improperly denied defendant's motions for dismissal of the indictment or certain counts of the indictment, judgment notwithstanding the verdict, or new trial. Fifth, the "court should have dismissed this indictment or certain counts of the indictment under the concept of due process entrapment." Sixth, the court "improperly refused to charge certain lesser-included offenses and certain proposed defenses." And finally, seventh, "the sentence in this case was excessive." We reject arguments five, six, seven, and most of four as lacking sufficient merit to require discussion in this decision. R. 2:11-3(e)(2). Although we also reject defendant's official misconduct, attempt, severance, other-crimes, and entrapment arguments, each requires discussion.

A.
We begin our legal analysis by noting our agreement with Judge Chaiet that defendant's use of public resources during business hours to further his illicit relationship with Krissy constituted official misconduct. N.J.S.A. 2C:30-2a. In our view, the evidence was adequate for the jury to convict defendant of this charge, even if the communications were neutral on their face, especially considering defendant's motive in maintaining his relationship with Krissy. See State v. Gleitsmann, 62 N.J.Super. 15, 21-23, 161 A.2d 747 (App.Div.), certif. denied, 33 N.J. 386, 164 A.2d 849 (1960).
To commit attempted sexual assault, defendant must take a "substantial *502 step" toward the commission of the crimes. State v. Perez, 177 N.J. 540, 553, 832 A.2d 303 (2003). In this case, defendant argues that because he failed to appear at the planned April 19th meeting with Krissy, the State's proofs on count 6 were insufficient to establish attempt. Defendant is mistaken.
To qualify as a "substantial step," the alleged conduct must "strongly corroborate[] his or her alleged criminal purpose." Ibid. There is no iron clad requirement in a sexual assault prosecution involving a child that defendant must arrive at a physical meeting with the targeted victim for preliminary "grooming" actions to ripen into an attempted sexual assault. In defendant's previous communications with Krissy, which culminated in the April 19th discussion, he asked her if she masturbated, if she would like to masturbate with girls, and if she would like him to teach her how to masturbate. In the April 19th conversation, he not only "taught" her how to masturbate, but subsequently asked her if she "[w]ant[ed] to try in person," as he could "show [her] more that way." He then gave her instructions detailing how she should dress to facilitate the masturbation, explaining how he would dress so she could recognize him, and establishing a relatively isolated meeting location.
This conversation, particularly within the context of the previous conversations, constituted a sufficient indication of his criminal purpose to constitute an attempt. See State v. Jovanovic, 174 N.J.Super. 435, 440-41, 416 A.2d 961 (1980) (Resentencing Panel), aff'd, 181 N.J.Super. 97, 436 A.2d 938 (App.Div.1981). Defendant's failure to complete the planned crime is inconsequential because the crime of attempt, in this appeal, rests in defendant's scheduling of the meeting. State v. Fornino, 223 N.J.Super. 531, 540, 539 A.2d 301 (App. Div.), certif. denied, 111 N.J. 570, 546 A.2d 499, cert. denied, 488 U.S. 859, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988) ("[E]ven if further major steps are required before a crime can be completed, or the accused had ample opportunity to desist prior to completing the crime, a jury can still conclude that an attempt has been committed.").
Finally, the fact that the jury could have also determined from this evidence that defendant was fantasy role-playing and never had any intention to meet with defendant does not support defendant's argument, as the evidence was sufficient for the jury to reject this defense and accept, beyond a reasonable doubt, the State's contention regarding defendant's true motivations.

B.
In defense of the entire prosecution, defendant argued that he never knowingly or intentionally possessed pornographic images, and that his conversations with Krissy were mere fantasizing with another person he believed to be an adult. By advancing these defenses, defendant placed in issue his motive and intent in conversing with Krissy and possessing the pornographic images, see State v. Covell, 157 N.J. 554, 565, 725 A.2d 675 (1999), which allowed the other bad-acts evidence to be admitted as probative of whether defendant intended to engage in sexual acts with Krissy, and whether he knowingly possessed the pornographic images. See N.J.R.E. 404(b). More specifically, the evidence tended to illuminate defendant's intention to personally or with other adults "teach" underage girls how to masturbate and then later have sex with them himself. Because of this goal, the evidence also tended to disprove defendant's assertion that he only inadvertently possessed child pornography.
*503 Accordingly, we agree with the trial court that the evidence of the other internet/telephone relationships defendant cultivated with fictional underage females and his sexual relationship with V.P. met the four part admissibility test established by State v. Cofield, 127 N.J. 328, 334, 605 A.2d 230 (1992). The other bad-acts evidence was relevant to a material issue, similar in kind and reasonably close in time to the charged offense, was clearly and convincingly established, and its probative value was not outweighed by the apparent prejudice. Id. at 338, 605 A.2d 230.
Though defendant vigorously challenges V.P.'s believability, we are bound by the trial court's credibility finding that the account of her sexual relationship with defendant was clear and convincing. State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999). In addition, we note that even though "evidence is shrouded with unsavory implications", it should not be excluded where, as here, "it is a significant part of the proof." State v. West, 29 N.J. 327, 335, 149 A.2d 217 (1959).

C.
Defendant challenges Judge Chaiet's refusal to sever the Krissy-related charges from the pornographic-image charges. A court's severance decision will be reversed only for an abuse of discretion. State v. Chenique-Puey, 145 N.J. 334, 341, 678 A.2d 694 (1996). Central to deciding the motion is "whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges." State v. Pitts, 116 N.J. 580, 601-02, 562 A.2d 1320 (1989). The admissibility of the evidence in both trials renders inconsequential the need for severance. State v. Coruzzi, 189 N.J.Super. 273, 299, 460 A.2d 120 (App.Div.), certif. denied, 94 N.J. 531, 468 A.2d 185 (1983).
Defendant placed his intent directly at issue by claiming that he was merely role-playing during the conversations with Krissy and that he did not knowingly possess pornographic images of children. State v. Rogers, 19 N.J. 218, 228, 116 A.2d 37 (1955)(rendering admissible proof of circumstances which "tend to shed light" on a defendant's motive and intent or "tend to fairly explain [a defendant's] actions[.]").
The trial court excluded some of the pictures, holding that no reasonable juror could find them to be of children under the age of sixteen. The remaining pictures and videos admitted were clearly and convincingly established to be of under age children. In fact, the State produced proof that the images were of children, some as young as under five years old.
Therefore, the pornographic images, though graphic, established defendant's purpose and intent in conversing with Krissy. The conversations and images revealed the basis of defendant's interest in children in general, and because he possessed the images around the same time he conversed with Krissy, with her in particular.
Thus, had the pornography charges been severed from the Krissy-conversation charges, the pornography found on defendant's computer would have been admissible as other-crimes or bad-acts evidence in the Krissy-conversation prosecution. Accordingly, there is no basis to reverse the court's severance decision. Coruzzi, supra, 189 N.J.Super. at 299, 460 A.2d 120.

D.
Defendant also contends that the trial court erred in denying his motion to *504 dismiss counts one through eight of the indictment on the ground that the State entrapped him, contrary to the Due Process Clause of the New Jersey Constitution. The due process entrapment defense is based on an objective theory of entrapment. State v. Johnson, 127 N.J. 458, 470, 606 A.2d 315 (1992). "The defense arises when conduct of government is patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of government, and offends principles of fundamental fairness." Id. at 473, 606 A.2d 315.
Once a defendant presents "some evidence of due process entrapment," the State bears the burden of proving, by clear and convincing evidence, that it did not entrap defendant. State v. Florez, 134 N.J. 570, 590, 636 A.2d 1040 (1994). Whether the State has satisfied that burden is a question of law for the trial court to decide. Id. at 584, 636 A.2d 1040.
Here, the trial court rejected defendant's due process entrapment defense, explaining that there was "absolutely no government entrapment." We agree with the trial court. Nothing prohibits the police from creating characters to conduct undercover investigations. Rather, "decoys, traps, and deceptions properly may be used to apprehend those engaged in crime or to obtain evidence of the commission of crime." State v. Rockholt, 96 N.J. 570, 575, 476 A.2d 1236 (1984). Here, the police did just that.
Besides their initial conversation, defendant had initiated almost all contact with Krissy. He was the first person to mention sex and masturbation; and, indeed, he repeatedly encouraged Krissy to masturbate on her own and with her girlfriends. He also offered to "teach" her how to do so, and proceeded to explain in sordid detail. Krissy merely agreed to his suggestions. She never "controlled [or] directed the commission of the crime," Johnson, supra, 127 N.J. at 474, 606 A.2d 315, and did not "resort to excessive inducements" to lure defendant. Id. at 479, 606 A.2d 315.

E.
Defendant also argues that his convictions should be reversed because the court's jury instructions on the 404(b) evidence and the statutory entrapment defense, N.J.S.A. 2C:2-12, had the capacity to mislead the jury as contradictory and confusing.
Proper jury instructions are essential to a fair trial. State v. Green, 86 N.J. 281, 287, 430 A.2d 914 (1981). The court must give the jury a "comprehensible explanation of the questions [they] must determine, including the law of the case applicable to the facts that the jury may find." Ibid. The jury charge should include instruction on all "essential and fundamental issues and those dealing with substantially material points." Id. at 290, 430 A.2d 914.
Here, the court instructed the jury four times on the permissible use of the bad-acts evidence pursuant to N.J.R.E. 404(b). The court gave the first instruction, which was essentially the same as the Model Jury Charge, just before the first 404(b) witness testified. The court gave the second instruction after a juror asked to have the 404(b) instruction in writing. The court refused to do so at that point in the trial, but gave the jury a summarized version of the foregoing instruction. After the State introduced the last of the 404(b) evidence, Judge Chaiet again gave the 404(b) instruction in its entirety. This instruction essentially repeated the guidance given the first time.
*505 The court gave the last 404(b) instruction during the final jury charge. The court described the 404(b) evidence as coming from several "witnesses who testified about other contacts they had with defendant which do not concern any of the charges in the indictment. These contacts occurred in 1999, 2000, 2001, 2002." The court explained the "contacts fell into two categories." The first included undercover officers "posing as a child who either contacted or were contacted by the defendant on the Internet and by telephone who were then engaged by him in sexual discussion." The second category included "a young woman who alleges she met the defendant online and subsequently had sexual intercourse with him in a motel in Northern New Jersey shortly after she []turned 16 years of age." The court then explained that the State claimed this evidence "demonstrates his state of mind, his intent as to the charges against him." But, the court emphasized that "[b]efore you can give any weight to this evidence, you must be satisfied that the defendant committed these other acts. If you are not so satisfied, you may not consider it for any purpose."
The charge then tracked the Model Charge, emphasizing that these other acts may not prove that defendant was "a bad person or that he had a general purpose to commit a crime or engage in the particular type of criminal contact alleged." Judge Chaiet further emphasized that "[i]n other words, this type of evidence could wrongly lead juries to conclude that because a defendant charged with a crime committed another similar act in the past, he also committed the offense or offenses he is charged within the indictment. The law simply does not allow this."
The court then utilized the specific claims of both parties and the specific evidence to show the jury how 404(b) evidence must be applied within the actual circumstances of this case. The court told the jury directly that they could use the 404(b) evidence to determine whether "defendant had an intent to interact with underage children and tends to prove he believed `Krissy' to be a 14 year old child. On the other hand, you can consider whether the evidence supports defendant's position that he was role-playing and had no intent to interact with underage children."
The court also told the jury they could use the evidence to determine whether "defendant knowingly possessed the images and videos in question, rather than came upon them by mistake or accident." The court concluded by reemphasizing that the jury could not use the evidence to establish that "because defendant may have committed these acts in the past, he is a bad person or had a general tendency to commit crimes and therefore committed any of these crimes charged in the indictment. You may only use it for the purpose I have outlined for you." In short, our review of the 404(b) aspect of the charge leads us to conclude that it was flawless.
The court followed its 404(b) charge with an instruction on the entrapment defense, and it is this juxtaposition that is some-what troubling. The court began by stating there was an "exception to" the 404(b) instruction. It explained that if the jury found defendant guilty of one or more of "Counts 1,3,4,5,6,7 and 8 of the indictment," the Krissy charges, "the defense asks you to consider the affirmative defense of entrapment."
The court told the jury that in considering the entrapment defense, the jury "may consider the evidence produced by the undercover officers and [V.P.] . . . on the issue of whether the defendant had a predisposition to commit the crimes and thus *506 was not entrapped." The court explained that "the law does not authorize a law enforcement officer to trap another person or by inducing or encouraging him to commit an offense and then as a direct result of that inducement or encouragement, cause that other person to commit an offense." In further explanation, the court stated that "defendant must prove that the police conduct, in fact, caused him to commit the crime. In other words, that the crime was a direct result of the police action."
The judge emphasized that if the jury found that the State had proven the elements of one or all of the Krissy charges beyond a reasonable doubt, then the jury must consider defendant's entrapment defense on any counts they have found defendant guilty. For this purpose, the jury could consider whether the 404(b) "evidence along with other facts and circumstances, [that] shows a predisposition on the part of the defendant to commit the offense. . . . If [the jury finds] the defendant had been predisposed to commit the offense even without the law enforcement officer's participation or inducement, then a defendant's participation was not the direct result of the officer's activity and the defense of entrapment hadn't been proven and is unavailable to [defendant]."
We are concerned with the jury's ability to abide by the two conflicting uses for the 404(b) evidence in light of the entrapment defense. See Biunno, Current N.J. Rules of Evidence, comment 16 on N.J.R.E. 404 (2006). The other-crimes or bad-acts evidence is not admissible to show predisposition to commit the crime charged. N.J.R.E. 404(b). There is an exception, however, when defendant raises an entrapment defense, which requires proof that his criminal conduct was caused by police conduct and not by his own mental state. State v. Gibbons, 105 N.J. 67, 76, 519 A.2d 350 (1987). When a defendant seeks to establish entrapment, the State may rebut that proof with evidence of predisposition, of which similar bad-acts are probative. Id. at 74, 519 A.2d 350. Normally, in such cases, a defendant raises entrapment through cross-examining the State's law enforcement personnel, or by offering direct evidence of his own. Id. at 74-77, 519 A.2d 350. When that occurs, the state's 404(b) evidence is presented in rebuttal and not in its case-in-chief. State v. White, 86 N.J.Super. 410, 421, 207 A.2d 178 (App.Div.1965).
Here, the 404(b) evidence was presented in the State's case-in-chief, for two reasons. First, it was relevant to defendant's general defense that he lacked criminal intent for all of the charges. Second, defendant had indicated prior to trial that entrapment would be pursued, though the issue was not clearly raised in the opening statement. R. 3:10-2(c), R. 3:12-1. We have previously found no error in presenting 404(b) evidence in the State's case-in-chief when the "defense of entrapment had been raised in defendant's opening." White, supra, 86 N.J.Super. at 421, 207 A.2d 178. In addition, our Supreme Court, in dicta, has noted that a defendant's opening statement may be sufficient to place entrapment in issue, even before defendant had presented proofs on the issue. State v. Dolce, 41 N.J. 422, 434, 197 A.2d 185 (1964). Because the 404(b) evidence was relevant to the general defense and defendant indicated before trial that an entrapment defense would be pursued, we cannot fault the prosecutor for presenting the 404(b) evidence in the State's case-in-chief.
Although we cannot fault the timing of the 404(b) evidence under the circumstances of this case, we believe the better practice, to ensure proper application of the 404(b) evidence, would have been accomplished *507 through a sequential trial with the same jury. See, e.g., State v. Ragland, 105 N.J. 189, 194, 519 A.2d 1361 (1986) (finding same jury should have decided possession of weapon by a convicted felon in a new trial after the jury found the defendant guilty of unlawful possession); State v. Ingenito, 87 N.J. 204, 217, 432 A.2d 912 (1981) (reaching the same conclusion but requiring a different jury on the second issue). If a sequential trial were utilized, the same jury would have first been instructed solely on the 404(b) evidence and its proper use in determining whether the State proved its case against defendant beyond a reasonable doubt. If there was a conviction, then the entrapment defense would be separately instructed and considered by the same jury.
In this case, however, defendant did not object to the charging of both entrapment and other-crimes or bad-acts before the same jury. Thus, we may reverse only if we find plain error. State v. R.B., 183 N.J. 308, 321, 873 A.2d 511 (2005). Here, the charges were clear and accurate, and we generally must assume that the jury followed such a charge. State v. Muhammad, 145 N.J. 23, 52, 678 A.2d 164 (1996); State v. Manley, 54 N.J. 259, 270, 255 A.2d 193 (1969). The court not only correctly stated the law, but it adequately explained that the jury could only consider the 404(b) evidence as proof of defendant's predisposition if it first found that defendant met his burden of showing that the State employed improper tactics to induce him to commit the crimes. In addition, the court clearly limited the jury's use of the "exception" permitting the consideration of the evidence as predisposition, only if the jury convicted defendant of the Krissy charges. The court precisely and clearly limited the use of the 404(b) evidence on the main charges to considering defendant's intent or motive. Thus, the jury knew that to convict defendant it could not use the 404(b) evidence as proof that defendant acted in conformity with his prior conduct.
Furthermore, there was no indication by any subsequent questions from the jury that there was any confusion about this part of the case. In addition, unlike the situation in Chenique-Puey, supra, 145 N.J. at 343, 678 A.2d 694, where evidence inadmissible against one of the conjoined charges was presented to the jury, here the 404(b) evidence was admissible to establish defendant's intent as well as his predisposition under the entrapment defense. But see State v. Lozada, 357 N.J.Super. 468, 472-73, 815 A.2d 1002 (App.Div.2003)(requiring sequential trials even though the challenged evidence was admissible against both conjoined charges). Under the circumstances of this case, we conclude that the instructions on 404(b) and entrapment were sufficiently clear and complementary to withstand defendant's challenge on appeal. See State v. LaBrutto, 114 N.J. 187, 203-04, 553 A.2d 335 (1989).
Consequently, while better practice might have utilized sequential trials and eliminated any possibility of misuse of the evidence, we cannot say that the failure to try the case sequentially was "clearly capable of producing an unjust result." R. 2:10-2. We cannot conclude that the possibility of the misuse of the evidence was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it might otherwise not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).

IV.
Accordingly, we find each of defendant's arguments wanting and affirm his conviction and sentence. To the extent we have not specifically discussed any of defendant's *508 numerous arguments, we emphasize that they have nevertheless been carefully considered and rejected upon our review of the argument in light of the record and pertinent law.
Affirmed.