**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2762-18T4
                A-2764-18T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MAURICE R. SANDERS,

    Defendant-Appellant.

_____

Submitted September 30, 2020 – Decided November 18, 2020

Before Judges Gilson and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Indictment No. 14-02-0059.

Joseph E. Krakora, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

Michael J. Williams, Acting Hunterdon County Prosecutor, attorney for respondent (Jeffrey L. Weinstein, Acting Assistant Prosecutor/Special Deputy Attorney General, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, we consider two aspects of the trial court's order entered following defendant Maurice R. Sanders's petition for postconviction relief (PCR):  allowing defendant to file a direct appeal pursuant to State v. Perkins, 449 N.J. Super. 309, 313 (App. Div. 2017), after finding defendant's appellate counsel was ineffective,[1] and denying that part of his petition claiming ineffective assistance of trial counsel.  On direct appeal, defendant argues:

> POINT I
>
> THE TRIAL COURT ERRED WHEN IT DENIED THE ENTRAPMENT MOTION.
>
> POINT II
>
> THE TRIAL COURT ERRED WHEN IT FAILED TO SUA SPONTE ORDER A MISTRIAL WHEN TRIAL COUNSEL CONCEDED HIS CLIENT'S GUILT CONTRARY TO MCCOY V. LOUISIANA, 138 S. CT. 1500 (2018).
>
> POINT III
>
> THE TRIAL COURT'S CUMULATIVE ERRORS DENIED [DEFENDANT] A FAIR AND RELIABLE TRIAL.

---

[1] We granted defendant's motion to file his notice of appeal as within time.

As to the denial of his PCR petition without an evidentiary hearing, he contends:

POINT I

AS [DEFENDANT] HAS ESTABLISHED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, THE PCR COURT ERRED WHEN IT DENIED HIS PETITION FOR [PCR].

(1) Trial Counsel's Failure to Submit a Timely Notice of a Duress Defense Irreparably Crippled [Defendant's] Right to a Complete Defense.

(2) Trial Counsel's Closing Remarks Undercut his Client's Claim of Innocence.

(3) Trial Counsel Failed to Investigate Whether [Codefendants] Martin and McNeil Could Provide Corroborating Testimony to a Duress Defense.

(4) Trial Counsel's Cumulative Errors Denied his Client Effective Legal Representation.

POINT II

AS THERE WAS A GENUINE ISSUE OF MATERIAL FACT IN DISPUTE, AN EVIDENTIARY HEARING WAS REQUIRED.

Although we determine the record does not support any claim of due process entrapment, because the trial court did not allow the jury to determine the issue of statutory entrapment, we are compelled to reverse and remand for a new trial.

3

Turning first to defendant's direct appeal, defendant argues the trial court erred when it denied his motion to dismiss the indictment because his convictions after jury trial of third-degree conspiracy to distribute a controlled dangerous substance, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5(b)(3) (count one), and third-degree distribution of a controlled dangerous substance, N.J.S.A. 2C:35-5(b)(3) (count two), were the result of police entrapment based on "text messages from the police . . . which induced him with offers of money and transportation." We review the trial court's determination of this question of law de novo, see State v. Florez, 134 N.J. 570, 584 (1994) (holding the question of whether due process entrapment occurred is a legal question), and conclude those texts belie defendant's contention as to due process entrapment.

Due process entrapment occurs when police engage in conduct that is "patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of government, and offends principles of fundamental fairness." State v. Johnson, 127 N.J. 458, 473 (1992). Although the burden of disproving the defense of due process entrapment by clear and convincing evidence falls upon the State, defendant must produce "some evidence of due process entrapment before [that] burden shifts to the State." Florez, 134 N.J. at 590.

Relevant factors to be considered by a court in taking "a comprehensive

4

approach encompassing careful scrutiny of the nature of government conduct in light of all the surrounding circumstances 'and in the context of proper law enforcement objectives,'" Johnson, 127 N.J. at 474, include:

> (1) whether the government or the defendant was primarily responsible for creating and planning the crime, (2) whether the government or the defendant primarily controlled and directed the commission of the crime, (3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable, and (4) whether the government had a legitimate law enforcement purpose in bringing about the crime.
>
> [Ibid.]

The text messages to which defendant refers began when an undercover Flemington Borough police officer called a cell phone number belonging to an individual known to police only as Amy in an attempt to purchase heroin. According to the officer's trial testimony, the texts culminated in the delivery of heroin to the officer when codefendant Amy Miller drove codefendant Craig McNeil[2] and defendant to a motel. Defendant exited the vehicle and approached the officer and, after a brief conversation, returned to the vehicle and appeared to talk to McNeil. Defendant reapproached the officer and, after moving to a less conspicuous location, removed a plastic bag containing bricks of heroin

---

[2] Both codefendants pleaded guilty and were not tried with defendant.

A-2762-18T4

from his pocket and exchanged the bag for $675 tendered by the officer. All three defendants were taken into custody when assisting officers stopped their vehicle shortly after they left the officer at the motel.

Before the texts began, the officer, using the pseudonym Bill, called Amy's telephone number and said Casey had given him the number. When the officer told the female who answered the call that Casey "said I could get from you," the woman replied, "[o]h, no, I don't do that [anymore]," and hung up; but not before the officer heard her tell someone that Casey had given her out number.[3] The officer received a text "a minute or two later" from the same phone number asking "who is this?" The officer again identified himself as Bill, and texted that he "used to hang [with] Casey," who told him "to hit you up if I need."

When the texter asked the officer if he drove, the officer replied he did not, but could "throw you something for the trip." In a series of subsequent texts, the texter asked "so what are you talking about?" The officer replied he

---

[3] The only appellate record of the recorded conversation and text messages are the officer's testimony about them. The quotes are the words used by the officer when he related the conversation and texts during his trial testimony. We do not know if they are direct quotes, but defendant references the transcript of that testimony in his statement of facts about the communications that led up to the heroin distribution.

A-2762-18T4

"was looking to see what he could do for three with travel," meaning he was inquiring about the cost of three bricks of heroin, including the costs of delivery. The texter inquired "three what," and when the officer replied, "full," the texter asked "what's three fulls (sic), never heard of that?" After the officer clarified he was seeking bricks, the texter responded "if you get me a ride." The officer replied, "if I can get you a ride, I'd get me a ride."

Nine minutes elapsed without communication before the officer texted, "so that's a no." The texter replied, "I don't know you like that, bro, you've got to be more careful." After a brief discussion regarding the texter's inquiry about "side work" the officer could provide, the texter said, "get a ride and I can make it happen."

The text discussion continued, and the texter eventually asked, "what kind of bread you got?" The officer asked "what do you want for them plus travel?" The texter responded "three breezies look like what?" The officer replied, "$225 each, includes," meaning $225 per brick including travel expenses.

Twelve minutes elapsed without a response. The officer texted, "can you make it happen, that's a good price." Another fifteen minutes passed without a response. The officer texted, "thanks, maybe next time."

A-2762-18T4

Two minutes later, the texter asked, "where you live?" The officer told the texter he was "crashing" at the Siesta Motel on Route 22. The texter confirmed he knew the location and, when asked if he was coming, the texter replied affirmatively and that he "was working on the ride, it's definite. I can't be BS'ing." The texter then asked, "[i]f I can't get three what do you want?" The officer replied he would take two. The texter asked if the officer was amenable to going with him to pick up the heroin. The officer said he couldn't leave but could walk to a location from the Siesta Motel; and said, "I'll hit you up again when you're good for three, it sounds like it's not going to happen tonight." The texter replied at 10:16 p.m. with the last message of the three-plus-hour exchange: "still working on it, give me [thirty] minutes, if not tomorrow definitely."

At 10:28 the next morning, the officer texted, "yo[,] you good for today?" The texter replied: "working on it now." The texter told the officer he could "be there by 2[:00] p.m." When asked what he had, the texter confirmed he had three bricks of heroin and that the officer was still at the Siesta Motel. He told the officer, "I'll come out to you at two . . . . [Y]ou gonna meet me there with how much[?]" When the officer replied "225 times 3," the texter answered, "exactly. Just making sure, man, you ain't on no BS with those, the people, you

8

know." After texts about the motel's location, the texter told the officer, "yo, don't go [nowhere]."

Nothing in these texts evidence any of the hallmarks of due process entrapment that can unduly influence the resistance of an ordinary citizen: "Tactics like heavy-handed pressure; repetitive and persistent solicitation, or threats or other forms of coercion; the use of false and deceitful appeals to such humanitarian instincts as sympathy, friendship, and personal need[.]" Johnson, 127 N.J. at 478.

The texter had many opportunities to walk away from the officer's request for heroin. The texter did not have to text back after Amy terminated the telephone call. The texter did not have to reinitiate communications after the officer asked, "so that's a no"; or after he texted, "thanks, maybe next time"; or after he said, "looks like it's not going to happen tonight." Instead, the texter doggedly kept the transaction alive, telling the officer that he was "working on a ride" but the transaction was "definite"; and, on the day of the distribution, that he was still "working on it."

The subterfuge used by the officer did not run counter to due process principles. In State v. Davis, 390 N.J. Super. 573 (App. Div. 2007), we approved of the police practice of creating persona to conduct undercover operations,

holding "'decoys, traps, and deceptions properly may be used to apprehend those engaged in crime or to obtain evidence of the commission of crime.'" Id. at 593 (quoting State v. Rockholt, 96 N.J. 570, 575 (1984)).

It is also evident, though the officer initiated the contact, he did not direct and control the enterprise. Johnson, 127 N.J. at 478. Negotiations included transportation for delivery. It is also evident the texter had to obtain the drugs, inquiring if "Bill" would go with him to pick up the heroin and asking about supplying only two bricks instead of three. And, the texter had to arrange for transportation to the Siesta Motel. The texter also picked the time of the meeting and told the officer he would meet him at the motel, and "don't go [nowhere]." We also note the context and tenor of the conversation evidences the texter's familiarity with the drug trade, notwithstanding the obvious lack of inventory and mode of distribution.

Nor was it objectively unreasonable to involve the texter in the purchase of heroin. See id. at 474. Obviously, Amy had been involved in drug distribution; when the officer said why he was calling, she told him she did not "do that anymore," connoting she had done so in the past. The return text, made soon after the phone call, also established the intent of the texter to distribute the drugs. And, the "legitimate law enforcement purpose in bringing about the

crime," ibid., is obvious. See State v. Talbot, 71 N.J. 160, 168 (1976) ("Government properly may use artifice to trap unwary criminals, particularly in its efforts to stamp out drug traffic."). In short, the undercover detective's conduct was not "'so egregious' as to offend due process." Johnson, 127 N.J. at 471. As in Johnson, there was no due process entrapment even though law enforcement developed the plan to purchase heroin. Id. at 461, 483. "The police conduct was 'an invitation, not a seduction.'" Id. at 479 (quoting People v. Paccione, 417 N.Y.S.2d 850, 852 (Nassau Cnty. Ct.1979)).

We observe the trial court did not perform any required analysis in denying defendant's motion to dismiss, opining

> [t]here is absolutely no evidence of entrapment on that statement [which defendant gave to police after his arrest]. None. He said he got a text. And he said, it was very clear, that it was his idea to get the drugs so he could make money.
> So insofar as entrapment was concerned, that was totally negated by the defendant on that tape. No evidence of entrapment.
> In fact, he said, "[l]ook, I'm an addict." He said it. "I'm an addict and I need money."
> And this particular transaction was done solely for the purpose of getting money so he could support his habit.
> There was absolutely no evidence of entrapment on there. None.

We do not countenance the trial court's failure to apply the law to the facts it discerned. R. 1:7-4(a). But we review orders, not decisions. Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001) ("[I]t is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion."). We agree defendant failed to proffer evidence of due process entrapment.

That does not, however, put an end to the issue. The trial court precluded defense counsel from developing the entrapment argument at the motion hearing. When counsel began his argument, stating "my client believes he was entrapped and he wanted to . . . ," the court interrupted, and the following colloquy ensued:

> THE COURT: Let me stop you right there.
>
> [DEFENSE COUNSEL]: Okay.
>
> THE COURT: There is absolutely no evidence of entrapment on that statement. None. He said he got a text. And he said, it was very clear, that it was his idea to get the drugs so he could make money.
> So insofar as entrapment was concerned, that was totally negated by the defendant on that tape. No evidence of entrapment.
> In fact, he said, "Look, I'm an addict." He said it. "I'm an addict and I need money."
> And this particular transaction was done solely for the purpose of getting money so he could support his habit.

There was absolutely no evidence of entrapment on there. None.

But - -

[DEFENSE COUNSEL]: Well, his contention is that he received texts from the police and that he was induced with offers of money and even offers of travel.

He also indicates that he didn't even have a driver's license and he ended up at this Siesta Motel, so, - -

THE COURT: But that –

[DEFENSE COUNSEL]: But for all of that he –

THE COURT: But that – I don't mean to interrupt you but that statement negates anything concerning an entrapment.

He said – right at the outset he said – and these were almost his words, he said some guy called, he needed drugs. "I ripped somebody off to support my habit."

He said he is an addict. That's what he said. That was about as clear as you can get insofar as the distribution was concerned.

I do agree with you that early on he was kind of negating any kind of a conspiracy, he kind of minimized that insofar as the role of anybody else is concerned except at the very end where he said that [codefendant McNeil] actually was the one that got the drugs, gave him the drugs so he could pass them along to this person and get the money.

But that whole idea of entrapment and all, that that – as far as I am concerned, that statement negates any defense of entrapment.

What were the other items?

13

Counsel continued with his motion to reveal a confidential informant's identity. As such, the record is not clear if defendant's basis for the entrapment defense was due process entrapment or, as he argues in his merits brief, statutory entrapment.

Statutory entrapment occurs when a law enforcement agent, "for the purpose of obtaining evidence of the commission of an offense, . . . induces or encourages and, as a direct result, causes" a defendant to commit an offense "by . . . [e]mploying methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it."[4] N.J.S.A. 2C:2-12(a)(2). As our Supreme Court explained,

> [t]he statutory defense has both subjective and objective elements. State v. Rockholt, 96 N.J. 570, 579 (1984). Subjective entrapment occurs when the police implant a criminal plan into the mind of an innocent person who would not ordinarily have committed the offense. Id. at 576. Objective entrapment takes place when the police conduct causes an average citizen to commit a crime or when the conduct is so egregious as to "impugn the integrity of the court that permits a conviction." State v. Fogarty, 128 N.J. 59, 65 (1992).
>
> [Florez, 134 N.J. at 583-84.]

---

[4] Defendant does not allege any law enforcement agent falsely represented to him that the heroin sale was not prohibited, the other mode of entrapment proscribed by N.J.S.A. 2C:2-12(a)(1).

Unlike, due process entrapment, statutory entrapment is an affirmative defense, which the defendant must prove by a preponderance of the evidence. Id. at 590; see also N.J.S.A. 2C:2-12(b). Whether a defendant meets that burden is an issue to be decided by a jury. Florez, 134 N.J. at 590.

After improperly foreclosing any discussion about defendant's entrapment defense during the motion hearing, effectively cutting off any further development of that issue, the trial court never presented that defense for the jury's consideration. Although there is no evidence of egregious police procedure establishing due process entrapment, the Legislature specifically provided "[t]he issue of [statutory] entrapment shall be tried by the trier of fact," not by the trial court. N.J.S.A. 2C:2-12(b). Notwithstanding the admissions made by defendant to police that the trial court noted, and his trial testimony that he did not take part in the texts, there was evidence the trier of fact may have considered in determining whether defendant met his burden with regard to statutory entrapment. The trial court's dismissal of that defense kept that issue from the jury and deprived defendant of a fair trial. See State v. Powell, 84 N.J. 305, 317 (1980) ("A defendant in a criminal case is entitled to have the jury consider any legally recognized defense theory which has some foundation in the evidence, however tenuous . . . . Very slight evidence on a theory of defense

will justify the giving of an instruction." (quoting People v. Dortch, 314 N.E.2d 324, 325-26 (Ill. App. Ct. 1974))); see also State v. Gentry, 439 N.J. Super. 57, 67 (2015) ("Where there is sufficient evidence to warrant a self-defense charge, failure to instruct the jury that self-defense is a complete justification for manslaughter offenses as well as for murder constitutes plain error."). As such, we are compelled to reverse.

Our decision obviates the need to consider defendant's remaining arguments in both appeals. We add the following comments about defendant's remaining direct-appeal arguments for the sake completeness.

There is no merit to defendant's contention the trial court erred if failing to sua sponte grant a mistrial during defense counsel's summation, a decision "entrusted to the sound discretion of the trial court, which should grant a mistrial only to prevent an obvious failure of justice." State v. Harvey, 151 N.J. 117, 205 (1997); see also State v. Montgomery, 427 N.J. Super. 403, 406-07 (App. Div. 2012). First, defendant's decision to voice, in open court, his displeasure about counsel's decision to tell the jury defendant was a drug user, instead of requesting a private consultation with counsel, was not a basis for a mistrial. Id. at 407. Such misconduct cannot be rewarded.

We also reject defendant's argument that a mistrial was required under McCoy v. Louisiana, 584 U.S. ___, 138 S. Ct. 1500 (2018). There, the defendant's trial counsel believed that the evidence of defendant's triple murder of family members was "overwhelming," and the best strategy would be to concede guilt during the guilt phase of the trial in order to persuade the jury not to impose a death sentence in the penalty phase of the trial. Id. at 1503. Defendant "vociferously" objected, insisted he was innocent and objected to any admission of guilt. Id. at 1505. Over defendant's objections, the trial court allowed defense counsel to tell the jury that the defendant committed the three murders. Ibid.

The United States Supreme Court reversed and ordered a new trial, id. at 1512, holding the Sixth Amendment to the federal Constitution guaranteed the right of a competent defendant to assert that he or she was innocent: "We hold that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." Id. at 1505. "[I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain

his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." Ibid.

In contrast, defendant's counsel had to offer an explanation for defendant's statement to the police where he not only admitted drug use, but said he texted with the officer, obtained the heroin from a third party and sold the heroin to the officer "to support [his] habit"; and his trial testimony that he delivered the drugs—knowing it was heroin—to the officer, collected $675 from the officer, brought the money back to the car, gave $475 to codefendant McNeil and kept $200 on his person.[5]  That defendant objected to defense counsel's strategy in handling those issues is a far cry from the defendant's objection to his counsel's actions in McCoy.  The trial court did not err when it did not sua sponte grant a mistrial.

---

[5] During his trial testimony, defendant denied he had participated in any texting with the officer or that he knew there was heroin in the vehicle prior to arriving at the motel.  He also started to explain that McNeil brandished a knife and threatened to kill Amy after they argued about money and drugs, in an attempt to support a duress defense; but that testimony was interrupted by the State's objection that defendant did not give notice of that defense.  See R. 3:12-1. Nevertheless, defendant later testified he delivered the drugs "before things g[o]t violent."

18

We also briefly comment on defendant's PCR claims because some of those issues may arise after remand. If we reached those issues, we would have remanded some of them for an evidentiary hearing.

Defendant attempted to establish he was forced to deliver the drugs in order to protect Miller from McNeil. It is evident from the sidebar discussion following the State's objection to defendant's testimony, and from the questions posed by defense counsel, that counsel knew defendant's intentions regarding the duress defense which was available to him if he delivered the heroin "because he was coerced to do so by the use of, or a threat to use, unlawful force against . . . the person of another, which a person of reasonable firmness in his situation would have been unable to resist." N.J.S.A. 2C:2-9(a).

Those facts establish a prima facie case, R. 3:22-10(b); State v. Preciose, 129 N.J. 451, 462 (1992), requiring an evidentiary hearing to ascertain why counsel did not file notice of the defense, foreclosing defendant's testimony. The record is barren of any discussion counsel and defendant had about the defense or defendant's testimony about the facts buttressing that defense.

That evidentiary hearing was necessary to discover whether defendant discussed and agreed to the trial strategy counsel implemented during his summation. Our analysis of this issue in the context of whether the trial court

19

erred in failing to sua sponte declare a mistrial did not address defendant's ineffective assistance of counsel argument. We fully realize counsel was faced with the thorny task of reconciling defendant's statement with his divergent trial testimony. But without an evidentiary hearing, we are unable to determine why counsel chose his ultimate tack or whether defendant consented. <u>See</u> <u>State v. Castagna</u>,187 N.J. 293, 315-16 (2006).

That hearing is no longer necessary, but the issues serve as a caution that should prompt counsel to fully discuss the trial issues with defendant prior to any future proceedings and take steps to advance any sound strategy.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION